UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIGILYTIC INTERNATIONAL FZE and
RISHAN BHAGOWAT,

                              Plaintiffs,

            – against –

ALCHEMY FINANCE, INC., ALCHEMY
COMPANY, LIMITED, ALCHEMY COIN
TECHNOLOGY, LIMITED, ALCHEMYZE
CAPITAL, LLC, SHENG-WEN CHENG,
JAHRIL TAFARI BELL, and DOES 1-20,

                              Defendants.

**OPINION & ORDER**

20 Civ. 4650 (ER)

RAMOS, D.J.:

 Digilytic International FZE and Rishan Bhagowat filed this action on June 17, 2020

against Alchemy Finance, Alchemy Company, Alchemy Coin, Alchemyze, Sheng-Wen Cheng,

Jahril Tafari Bell, and Does 1-20.  Doc. 1.  Plaintiffs allege securities fraud, violations of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), and various common law causes

of action stemming from defendants' sale of purported securities in the form of cryptocurrency

tokens for an alleged blockchain-based business as well as defendants' breach of service

agreements.  *Id.  Pro se* defendant Bell filed a motion to dismiss on February 24, 2021.  Doc. 52.

Plaintiffs amended their complaint in response to the motion on March 17, 2021.  Doc. 57.

        On April 9, 2021, Bell filed a motion to dismiss the First Amended Complaint.  Doc. 59.

For the reasons set forth below, the motion to dismiss is GRANTED in part and DENIED in part.

I.     **BACKGROUND**

The following facts are based on the allegations in the First Amended Complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).[1]

Digilytic is a United Arab Emirates company. ¶ 11. Rishan Bhagowat is a South African national and resident of the United Arab Emirates. ¶ 10.

Alchemy Finance is a Delaware corporation with its principal place of business in New York. ¶ 14. Alchemy Company and Alchemy Coin are Hong Kong companies with their principal place of business in New York. ¶¶ 15–16. Alchemyze is a New York limited liability company with its principal place of business and citizenship in New York. ¶ 17.[2] Together, these four entities are referred to as "Alchemy."

Sheng-Wen Cheng,[3] also known as Justin Jung, Justin Chang, and Justin Cheng, is a South Korean national who resides in New York. ¶ 12. Cheng is the co-founder and a controlling person of Alchemy. *Id.* Jahril Tafari Bell is a resident of the District of Columbia. ¶ 13. Bell is a co-founder of Alchemy, having started working with Cheng on February 1, 2018 as the Chief Business Development Officer of Alchemy. *Id.* A few months later, Bell became a majority shareholder and Chief Executive Officer ("CEO") of Alchemy Finance. *Id.* Bell is a controlling person of all of the corporate defendants. *Id.* Bell also founded a company called

---

[1] Unless otherwise noted, citations to "¶ _" refer to the First Amended Complaint, Doc. 57.

[2] Does 1-20 have not been identified. ¶ 18.

[3] Cheng recently pled guilty to four criminal charges related to his ownership of Alchemy and other corporate entities. *See USA v. Cheng*, 21 Crim. 261 (AJN), Doc. 33 (August 19, 2021). One of the charges to which he pled guilty was securities fraud, for the same conduct at issue in the instant matter. *Id.*, Doc. 16 (April 20, 2021). Cheng was sentenced to a term of 72 months. *Id.*, Doc. 33 (August 19, 2021). Cheng was also ordered to pay restitution, $250,000 of which is to be paid to Digilytic c/o Bhagowat as restitution for the amount Digilytic and Bhagowat invested in Alchemy. *See id.*, Doc. 44 (November 24, 2021); *id.*, Doc. 45 (November 24, 2021).

Legacy Metropolitan, LLC on February 15, 2018, about two weeks after he began working with Cheng and Alchemy.  *Id.*  According to Legacy's website, it is a Washington, D.C. real estate company that "specializes in home buying and selling solutions."  *Id.*

Cheng and Bell met in late 2017 or early 2018 and agreed to create an allegedly fraudulent business which would capitalize on the booming cryptocurrency industry by inducing investors to give them money.  ¶ 28.  In January and February 2018, they agreed to draft a fraudulent "white paper" to distribute to investors to induce them to transfer funds to defendants in exchange for a fraudulent "initial coin offering."  ¶ 29.  Defendants entered into a written "Consulting Services Agreement" on February 1, 2018 whereby Bell would craft the white paper by February 14, 2018 in exchange for a $40,000 fee paid by Alchemy.  ¶ 30.

On February 12, 2018, Bell, acting through Legacy, entered into a written agreement with Alchemy titled "Legacy/Alchemy Finance Public Relations Agreement," whereby Bell was to provide Alchemy with public relations services in exchange for a $25,000 monthly fee paid to Legacy.  ¶ 31.  On February 23, 2018, Bell, acting through Legacy, entered into a second written agreement with Alchemy titled "Consulting Services Agreement" whereby Bell was to provide consulting services related to business strategy in exchange for a $20,000 fee.  ¶ 32.

In February 2018, Cheng and Bell agreed to falsely tell potential investors that Alchemy had received a $30 million investment in their initial coin offering from Staxx Solutions Capital, a Dubai-based company that Bell had a previous relationship with through Legacy.  ¶¶ 33–34.

On March 13, 2018, Cheng emailed Bhagowat and provided a written business summary of Alchemy prepared by Bell.  ¶¶ 40–42.  The summary stated that defendants had built a functioning blockchain-based peer-to-peer lending platform headquartered in New York "for

Crypto investors who want a valuable investment opportunity . . . and for traditional financial investors looking for products that provide a higher rate of return." ¶¶ 40–42.

On March 15, 2018, to induce plaintiffs to transfer $250,000 and provide defendants with marketing and advisory services, Cheng informed plaintiffs by email and telephone of Staxx's purported investment in the offering. ¶ 35. On the same day, "in cooperation with and aided and abetted by Bell," Cheng emailed the white paper Bell had prepared to Bhagowat in Dubai from Alchemy's New York office. ¶ 36. The white paper stated that it was developed by Alchemy Company and described Alchemy as "a blockchain-based peer-to-peer lending marketplace" that was "classifying [its] token sale as a [fully registered] security." ¶¶ 37–38. It also provided a percentage breakdown of Alchemy's business functions and listed the global markets in which they would invest funds. ¶ 38.

Also on March 15, 2018, Cheng participated in an interview on YouTube with David Weild, an advisor to Alchemy and former vice chairman of NASDAQ. ¶ 43. Cheng and Weild represented that Alchemy had raised significant investments and retained legal counsel to conduct fully registered securities offerings through the sale of cryptocurrency tokens. *Id.* Then on March 18, 2018, Cheng represented to Bhagowat via email and phone calls that defendants would sell plaintiffs $250,000 worth of Alchemy cryptocurrency tokens. ¶ 44. The next day, Cheng emailed Bhagowat and represented that Alchemy had a functioning beta version of its software that would support its cryptocurrency and operate its AI-powered lending platform. ¶ 45.

On March 23, 2018, Cheng signed a written "Token Purchase Agreement" on behalf of defendants that promised to sell and deliver securities in the form of Alchemy tokens to plaintiffs, which he then sent to plaintiffs. ¶ 46. The agreement stated that Alchemy Company

was the "record owner of outstanding shares of the token[s]" and had "authority to sell 320,513.00 Alchemy token[s] with [a] 35% discount that [was] worth $250,000." ¶ 47. The agreement also stated that Alchemy would "sell, convey, transfer, and deliver to [plaintiffs] the corporation's Token[s]" in exchange for $250,000. *Id.*

In reliance on the white paper, the business summary, and Cheng's statements, plaintiffs executed the Token Purchase Agreement while in Dubai and emailed it to Cheng's New York Alchemy office on March 23, 2018. ¶ 49. Digilytic transferred $250,000 to Alchemy via wire transfer on March 26, 2018. ¶ 50. Plaintiffs did so with the expectation that they would receive a substantial return on their investment. ¶ 54.

Defendants also fraudulently induced plaintiffs to enter into two service agreements. ¶ 62. On March 24, 2018, Cheng executed a "Master Services Agreement" ("MSA") with plaintiffs which stated that Digilytic would provide Alchemy with marketing services in exchange for $32,000 a month plus expenses. ¶ 64. On the same day, Cheng executed an "Advisory Agreement" with plaintiffs that Bhagowat would provide Alchemy with consulting services in exchange for payment of 0.5% of all funds raised by defendants. ¶ 65. Plaintiffs performed their obligations under both agreements, ¶ 71, and allege that defendants never intended to honor these agreements. ¶ 67.

Specifically, plaintiffs organized a promotional dinner for Alchemy at the April 2018 Coachella Festival in southern California, for which they advanced defendants $21,000 to secure a place at the event. ¶ 72. Bhagowat then met with Cheng on April 5, 2018 in New York City, and Cheng apologized for not having paid the invoice yet, promising to make the payment shortly. ¶ 73. Plaintiffs sent further invoices for their services and expenses totaling $85,000, all of which went unpaid. ¶¶ 74–75.

Legacy became the majority shareholder of Alchemy Finance on June 18, 2018 pursuant to a "Subscription Agreement." ¶ 79. The next day, Bell emailed Bhagowat and falsely stated that Cheng was no longer associated with Alchemy, and that Alchemy had obtained an additional $1 million investment. ¶ 78. Bell also stated that Alchemy would soon pay plaintiffs' outstanding invoices. *Id.* Bell also claimed that he was taking over as temporary CEO of Alchemy Finance. ¶ 79. Around this time, Bell orally represented to plaintiffs that Alchemy could not use the $30 million invested by Staxx to pay the invoices because of an alleged provision by which the $30 million could not be accessed until Alchemy separately raised an additional $10 million, a statement Bell knew was false. ¶ 81.

Also around this time, Bell, Cheng, Legacy, and Alchemy Finance entered into a written agreement to form a New York limited partnership with Legacy as the general partner and Cheng as a limited partner for purposes of investing with Alchemy Finance. ¶ 80. In approximately July 2018, Bhagowat corresponded with Bell, inquiring as to how his $250,000 and the $30 million Staxx invested were being used. ¶ 82. Bell responded that Bhagowat's investment was being used to develop the trading platform while Staxx's investment had been frozen by another Alchemy principal. *Id.* Bell also forwarded Bhagowat a copy of a purported Token Purchase Agreement executed on March 3, 2018 by a Staxx representative, whereby the representative invested the $30 million in two installments of $15 million each, one upon execution and the other on March 13, 2018. ¶ 83. Bell then forwarded a copy of a purported wire transfer reflecting a March 13, 2018 wire transfer of $30 million from Staxx. ¶ 84. Both the agreement and wire transfer were fake. ¶ 85.

Cheng and Bell continued to make knowingly fraudulent misrepresentations through 2018 and into 2019 by stating online that they were conducting "token swaps" that they claimed

increased Alchemy's value and liquidity.  ¶ 56, 77.  They also claimed that they had received

further investments when they had actually received none.  ¶ 57.  Defendants never registered

their tokens with the Securities Exchange Commission (SEC).  ¶ 59.  In reliance on these

representations, plaintiffs continued to provide services to defendants.  ¶ 87.  Eventually,

defendants ceased responding to plaintiffs' communications and never paid any money to

plaintiffs, using the $250,000 investment for their own personal benefit.  ¶¶ 88–89.

Plaintiffs also allege that the corporate defendants are sham entities organized and

operated as the alter ego of each other and of Cheng and Bell.  ¶ 19.  They allege that Cheng and

Bell exercised complete dominion over the corporate defendants and acted in concert to

fraudulently induce plaintiffs to transfer them funds while shielding themselves from liability.

*Id.*  Further, they allege that Cheng and Bell controlled these entities for their personal benefit,

ignored "almost all" corporate formalities, and intermingled their personal and financial affairs

so that defendants were "indistinguishable from one another functionally and financially."  *Id.*

Plaintiffs thus bring claims of fraudulent inducement, ¶¶ 90–95, breach of contract, ¶¶

96–105, unjust enrichment, ¶¶ 106–12, account stated, ¶¶ 113–15, violation of Section 10b of the

Securities Exchange Act and Rule 10b-5, ¶¶ 116–22, Section 12 of the Securities Exchange Act,

¶¶ 123–27, and Section 17(a) of the Securities Exchange Act, ¶¶ 128–31, aiding and abetting

fraud, ¶¶ 132–41, and violation of RICO Section 1962(c), ¶¶ 142–50.

In his motion to dismiss, Bell argues that the FAC fails:  (1) to comply with the pleading

requirements of Federal Rule of Civil Procedure 8; (2) to state a claim upon which relief can be

granted; and (3) to plead fraud with sufficient particularity.

## II.     LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Christie's Int'l PLC*, 699 F.3d at 145. However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.    DISCUSSION

### a.   Rule 8

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to make a short and plain statement showing that the pleader is entitled to relief. As set forth in *Iqbal*:

> [T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.

*Iqbal*, 556 U.S. at 678 (internal citations, quotation marks, and alteration omitted).

Bell argues that the FAC fails to satisfy Rule 8 as it does not include particularized allegations of misconduct and instead contains only vague and conclusory allegations. The Court disagrees. As summarized above, the complaint contains detailed explanations of the events supporting the claims, including the names and dates of relevant agreements and parties involved, references to specific communications between the parties, and specific dollar amounts alleged to have been the subject of the defendants' scheme. This pleading is sufficient to survive a motion to dismiss. *See Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995) (reversing dismissal of a claim where the complaint gave a timeframe, location, and description of the alleged violations).

### i. *Shotgun and Puzzle Pleading*

Bell next argues that the FAC should be dismissed due to impermissible "shotgun" and "puzzle" pleading. Shotgun pleadings are those which incorporate by reference the previous paragraphs of allegations and merely recite the elements of each claim, leaving defendants and the court to parse out which facts apply to which claim. *See Sec. & Exch. Comm'n v. SeeThruEquity, LLC*, No. 18 Civ. 10374 (LLS), 2019 WL 1998027, at *3 (S.D.N.Y. Apr. 26, 2019). Puzzle pleadings are those that include lengthy block quotes followed by pro forma statements that the quotes are false, a type of pleading that courts have found fails to state a claim as insufficiently particular. *See Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). Further, Bell argues that the FAC refers to "Defendants" generally rather than specifically alleging Bell's personal involvement.

The FAC in the instant case suffers from none of these deficiencies. Contrary to Bell's assertions and as summarized in the Background section above, the complaint clearly indicates the names, dates, amounts, documents, and locations at issue in these claims, as well as the

details of Bell's personal involvement, such as in preparing the purportedly fraudulent white

paper and business summary.  ¶¶ 29–30, 36–39, 51, 60, 135.  The FAC references the specific

facts supporting each enumerated claim.  *See generally* ¶¶ 90–150.  The complaint is not

"'confusing' and is not drafted in a manner that gives rise to an inference of bad faith.

Moreover, it must be noted that the incorporation of preceding paragraphs into subsequent causes

of action is a standard practice, specifically permitted by [F.R.C.P.] Rule 10(c) . . . ."  *Iconix*

*Brand Grp., Inc. v. Bongo Apparel, Inc.*, No. 06 Civ. 8195 (DLC), 2008 WL 2695090, at *3

(S.D.N.Y. July 8, 2008).  Therefore, the motion to dismiss on these bases is denied.

**b.  Failure to State a Claim**

Bell next argues that the FAC fails to state a claim as to several of the claims.

i.  *Veil Piercing*

As a threshold matter, plaintiffs argue that the FAC alleges that Bell is personally liable

on plaintiffs' claims under a veil-piercing theory.

"New York courts apply a presumption of separateness to corporations and are hesitant to

disregard the corporate form."  *Prescient Acquisition Grp., Inc. v. MJ Pub. Trust*, 2006 WL

2136293, at *4 (S.D.N.Y. July 31, 2006) (citing *DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65,

70 (2d Cir. 1996)).  To prove that the corporate veil should be pierced under New York law, a

plaintiff must show "(1) that the owner exercised complete domination over the corporation with

respect to the transaction at issue; and (2) that such domination was used to commit a fraud or

wrong that injured the party seeking to pierce the veil."  *Thrift Drug, Inc. v. Universal*

*Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (quoting *Am. Fuel Corp. v. Utah Energy*

*Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).  Courts in New York consider the following factors

in analyzing whether the corporate veil can be pierced because an alter ego relationship exists:

(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*In re Amaranth Nat. Gas Commodities Litig.*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009), *aff'd*, 730 F.3d 170 (2d Cir. 2013).  "[C]onclusory allegations of an alter ego are insufficient to survive a motion to dismiss." *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 403 (S.D.N.Y. 2007) (internal citations omitted).

In the instant matter, the FAC alleges that Bell exercised "complete dominion and control" over the Alchemy entities to defraud plaintiffs.  ¶ 19.  Specifically, plaintiffs allege that Bell, acting through Legacy, is the majority shareholder, CEO, and founder of Alchemy Finance, ¶¶ 13, 79, one of the Alchemy entities that was "a mere sham . . . organized and operated as the alter ego of [the other Alchemy entities] . . . ."  ¶ 19.  Further, Bell allegedly signed a written agreement creating a New York limited partnership with Legacy as the general partner and Cheng as a limited partner to invest through a general partnership with Alchemy Finance.  ¶ 80. The FAC also alleges commingling of funds between the Alchemy entities and Bell, ¶ 104, ignoring of corporate formalities, ¶ 19, and joint use of the entities to fraudulently induce plaintiffs to engage in business and shield defendants from liability, ¶ 19.

While overlapping ownership and personnel alone cannot establish an alter ego relationship, *see In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 296 (S.D.N.Y. 2005); *In re Amaranth Nat. Gas Commodities Litig.,* 587 F. Supp. 2d 513, 538 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013), plaintiffs have plead facts that "tend to show that [the defendants] used the close relationship to dominate [the alter ego]." *Parmalat*, 375 F. Supp. 2d at 297.  Further,

plaintiffs have plead the necessary causative element of the use of domination to cause injury to the plaintiffs. *See VariBlend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, No. 18 Civ. 10758 (ER), 2019 WL 4805771, at *18 (S.D.N.Y. Sept. 30, 2019). Plaintiffs "adequately allege[ ] facts to raise a reasonable expectation that discovery will reveal evidence to support his veil-piercing claim." *Rothstein v. Mahne*, No. 15 Civ. 3236 (VEC), 2015 WL 6828061, at *6 (S.D.N.Y. Nov. 5, 2015) (denying motion to dismiss where complaint alleged domination of a shell company, commingling of assets, and use of the company to commit a wrong injuring plaintiff). Therefore, for purposes of the motion to dismiss, allegations in the complaint against Alchemy are interpreted as allegations against Bell as Alchemy's alter-ego. *Id.*

ii. *Breach of Contract*

Bell argues that there was no contract between plaintiffs and Bell.

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the [party bringing the claim], (3) breach of contract by the [other party], and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citations omitted). "When pleading these elements, a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003) (citing *Levy v. Bessemer Trust Co., N.A.*, No. 97 Civ. 1785, 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997)).

Plaintiffs have alleged the existence of three separate contracts between plaintiffs and defendant Alchemy Company: (1) Token Purchase Agreement, (2) the Master Services Agreement, and (3) the Advisory Agreement. ¶¶ 49, 64, 65. Plaintiffs performed on the Token Purchase Agreement by wiring Alchemy $250,000, ¶ 50, and allege that defendants breached the

contract by never providing the non-existent tokens.  ¶ 51.  Plaintiffs allege $250,000 in damages

for this breach.  ¶¶ 98, 105.  Plaintiffs performed on the MSA by organizing events and

providing other services, ¶¶ 72, 87, and allege that defendants breached the contract by never

paying their invoices.  ¶ 102.  Plaintiffs allege $85,000 in damages for this breach.  *Id.*  Lastly,

plaintiffs performed on the Advisory Agreement by performing consulting services, ¶¶ 92–93,

97, and allege that defendants breached the contract by never paying the 0.5% fee on all funds

raised by defendants. ¶ 101.  Plaintiffs allege $230,000 in damages from this breach.  *Id.*  These

allegations, while not specifically quoting the particular contract provisions at issue, do give the

Court and the defendants "notice of the transactions [and] occurrences . .  intended to be proved

as well as the material elements of each cause of action."  *Maldonado v. Olympia Mech. Piping

& Heating Corp.*, 8 A.D.3d 348, 350 (N.Y. App. Div. 2004) (internal quotation marks and

citation omitted).  The motion to dismiss is thus denied.

### iii.  *Fraudulent Inducement*

Bell argues that the fraudulent inducement claim should be dismissed as duplicative of

the breach of contract claim.

To state a claim for fraudulent inducement under New York law, a claimant must allege

that "(1) defendant made a representation as to a material fact; (2) such representation was false;

(3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the

statement and was induced by it to engage in a certain course of conduct; and (5) as a result of

such reliance plaintiff sustained pecuniary loss."  *Stephenson v. PricewaterhouseCoopers, LLP*,

482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order) (internal

quotation marks and citation omitted); *Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt.,

L.P.*, 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (stating that the fraudulent inducement elements

are similar to common law fraud elements).  In addition, "the Complaint must . . . state with particularity the circumstances of the fraud under Rule 9(b) and contain sufficient facts, accepted as true, to state claims for relief for common-law fraud that are facially plausible under Rule 8(a)(2)."  *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 700–01 (S.D.N.Y. 2012).

Moreover, even where a fraud claim is sufficiently pled, "[u]nder New York law, no fraud claim is cognizable if the facts underlying the fraud relate to the breach of contract."  *Auerbach v. Amir*, No. 06 Civ. 4821 (RJD), 2008 WL 479361, at *5 (E.D.N.Y. Feb. 19, 2008) (internal quotation marks and citations omitted); *see also Kriegel v. Donelli*, No. 11 Civ. 9160 (ER), 2014 WL 2936000, at *13 (S.D.N.Y. June 30, 2014) ("Under New York law, a fraud-based claim must be sufficiently distinct from a breach of contract claim . . . .") (internal quotation marks and citation omitted).  The Second Circuit has instructed that where fraud claims are brought alongside contract claims, the fraud claims may only proceed where plaintiff can "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs. Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (internal quotation marks and citations omitted).  A party's mere promise to perform its contractual obligations, even if knowingly false at the time of making, is not enough to support a claim of fraud under New York law.  *See Bridgestone*, 98 F.3d 13 at 19.  A successful fraudulent inducement claim should be "premised on misrepresentations [of material fact] that were made before the formation of the contract and that induced the plaintiff to enter the contract."  *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (internal citation omitted).  If a promise to take some future action is collateral to the terms of the contract itself, it can be

considered a misrepresentation for the purposes of a fraudulent inducement claim.  *See Deerfield Comms. Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004, 510 N.Y.S.2d 88 (N.Y. 1986) (finding that "a promise [not contained in the written agreement] made with a preconceived and undisclosed intention of not performing it . . . constitutes a misrepresentation" for purposes of a fraudulent inducement claim).

In the instant matter, the claim for fraudulent inducement is sufficiently distinct from the breach of contract claim.  The alleged misrepresentations regarding the existence of a lending platform and the $30 million Staxx investment are "misrepresentations . . . made before the formation of the contract . . . that induced the plaintiff to enter the contract."  *Cohen*, 25 F.3d at 1173; *see also Estrada v. Dugow*, No. 15 Civ. 3189 (ER), 2016 WL 1298993, at *7 (S.D.N.Y. Mar. 31, 2016) (explaining that fraudulent inducement claims may proceed parallel to breach of contract claims where "false financial information constituted a misstatement of present fact separate and apart from the purchase agreement[.]").

Plaintiffs have also sufficiently alleged fraudulent inducement by identifying material misrepresentations regarding the existence of outside investments, the availability of registered securities, and the existence of a functioning lending platform, among other representations.  ¶¶ 30–32, 36–42.  Further, they allege that Bell knew the statements were false when made, and made the statements with the intent to deceive plaintiffs and induce them to purchase tokens and provide services.  ¶¶ 51, 92.  In satisfaction of Rule 9(b)'s heightened pleading requirements, plaintiffs have explained that the statements were false because the outside investments, securities registrations, and lending platform did not exist.  ¶¶ 6, 51, 135.  Lastly, plaintiffs have alleged that they justifiably relied on the representations to enter into the agreements, resulting in a total of $565,000 in damages.  Accordingly, the motion to dismiss is denied.

iv.   *Unjust Enrichment*

Similarly, Bell moves to dismiss the unjust enrichment claims as duplicative of the breach of contract and fraudulent inducement claims.

To state a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiffs' expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.  *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004), *cert. denied*, 544 U.S. 949 (2005). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'"  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905 (N.Y. App. Div. 1999)).  The New York Court of Appeals has warned that unjust enrichment "is available only in unusual situations" and has noted that the typical such case is one "in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled."  *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012) (citing *Markwica v. Davis*, 473 N.E.2d 750 (N.Y. 1984); *Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790 N.Y.S.2d 84 (N.Y. App. Div. 2005)).  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Corsello*, 18 N.Y.3d at 791 (citations omitted).

Plaintiffs argue that the unjust enrichment claim is not duplicative of the breach of contract claim.  However, they do not address whether the claim is duplicative of the fraudulent inducement claim.  The complaint largely repeats the allegations from the fraudulent inducement claim in explaining the claim for unjust enrichment, seeking the same $565,000 based on the same agreements, services, and transactions.  Therefore, the claim is duplicative of the fraudulent inducement claim and the motion to dismiss is granted.  *See Mitchell v. Whole Foods Mkt. Grp.,*

16

*Inc.*, No. 20 Civ. 8496 (ER), 2022 WL 657044, at *11 (S.D.N.Y. Mar. 4, 2022) (dismissing unjust enrichment claim as duplicative of other claims).

> v.  *Account Stated*

Bell moves to dismiss the claim for account stated on the basis that plaintiffs have not alleged a transaction between Bell and the plaintiffs.

To prevail on a claim for account stated, the plaintiff bears the burden of establishing that "(1) an account was presented; (2) it was accepted as correct; and (3) the debtor promised to pay the amount stated." *Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 570 (S.D.N.Y. 2013) (quoting *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)) (additional citation omitted). The second and third elements may be implied if "a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment." *IMG Fragrance Brands* 679 F. Supp. 2d at 411 (quoting *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999)).

Where the relief on an account stated claim is not distinct to the relief sought on another claim, courts may find that a claim for account stated is duplicative. *See New Am. Mktg. FSI LLC v. MGA Ent., Inc.*, 187 F. Supp. 3d 476, 482 (S.D.N.Y. 2016) (citing *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008)). Here, plaintiffs seek $85,000 under the account stated claim for their unpaid invoice submitted as part of the MSA. ¶¶ 113–15. This amount is already sought in relation to the fraudulent inducement claim, so the Court is inclined to dismiss this claim as duplicative. However, Bell has not raised this argument in his motion to dismiss. As plaintiffs have not had an opportunity to be heard on this issue, the Court will not dismiss the claim for this reason at this time. *See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir.

1991) (requiring notice and opportunity to be heard before *sua sponte* dismissing a claim).

Instead, the Court examines whether plaintiffs have adequately stated a claim.

The FAC alleges that defendants received invoices for the services plaintiffs provided

under the MSA and Advisory Agreement.  ¶ 74.  It also alleges that defendants accepted the

invoices and never disputed them, except to acknowledge that they still owed payment.  ¶¶ 82

(Bell explained to Bhagowat that "the reason that Alchemy had not yet paid [the] invoices" was

that the Staxx investment had been frozen), 114.  Payment was due pursuant to the MSA and

Advisory Agreement.  ¶¶ 64–65.  As the elements are sufficiently alleged, the motion to dismiss

is denied.

> vi.  *Section 10(b) and Rule 10b-5 of the Securities Exchange Act*

Bell argues that the Section 10(b) and Rule 10b-5 claim should be dismissed because Bell

did not make any false statements within the meaning of the law, plaintiffs have not sufficiently

alleged scienter, and the conduct alleged is not in connection with the sale of a security within

the meaning of the law.

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing "in

connection with the purchase or sale of any security . . . any manipulative or deceptive device or

contrivance," while SEC Rule 10b-5, promulgated thereunder, creates liability for a person who

makes "any untrue statement of a material fact or . . .  omit[s] to state a material fact . . . in

connection with the purchase or sale of any security."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d

387, 397 (S.D.N.Y. 2013).  A statement may give rise to liability under § 10(b) if it is "(1) a

material misrepresentation; (2) a material omission in contravention of an affirmative legal

disclosure obligation; or (3) a material omission of information that is necessary to prevent

existing disclosures from being misleading."  *Police & Fire Ret. Sys. of the City of Detroit v. La*

*Quinta Holdings Inc.*, No. 16 Civ. 3068 (AJN), 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24,

2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018) (internal quotation marks and citation omitted).

Rule 10b–5, promulgated to implement Section 10(b), "more specifically delineates what

constitutes a manipulative or deceptive device or contrivance." *Press v. Chem. Inv. Servs. Corp.*,

166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b–5, it is unlawful for any person, directly or

indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue
> statement of a material fact or to omit to state a material fact necessary in order to make
> the statements made, in the light of the circumstances under which they were made, not
> misleading, or (c) To engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person, in connection with the purchase or
> sale of any security.

17 C.F.R. § 240.10b–5.  To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must

plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter,

*i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4)

that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.

*In re Express Scripts Holding Co. Sec. Litig.*, No. 16 Civ. 3338 (ER), 2017 WL 3278930, at *10

(S.D.N.Y. Aug. 1, 2017) (citations omitted); *see also Carpenters Pension Tr. Fund of St. Louis v.

Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).  Moreover, the plaintiff must meet the PSLRA

requirements.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553

F.3d 187, 196 (2d Cir. 2009).  Therefore, while the Court normally draws reasonable inferences

in favor of a non-movant on a motion to dismiss, the PSLRA "'establishes a more stringent rule

for inferences involving scienter' because the PSLRA requires particular allegations giving rise

to a strong inference of scienter."  *Id.* (citing *Teamsters Loc. 445 Freight Div. Pension Fund v.

Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

"Plaintiffs can establish the requisite 'strong inference of fraudulent intent' either (a) by demonstrating 'that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 560 (S.D.N.Y. 2004) (citing *Kalnit*, 264 F.3d at 138–39).  To show motive and opportunity to commit fraud, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud" that is more than a generalized motive that any public for-profit company might have.  *Kalnit*, 264 F.3d at 139–40.  To show strong circumstantial evidence of conscious misbehavior or recklessness, a plaintiff must allege "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *ECA*, 553 F.3d at 202–03 (quoting *Kalnit*, 264 F.3d at 142).  The standard is higher than enhanced negligence and has been described as "a state of mind *approximating actual intent*."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks and citation omitted).  In general, there are

> [a]t least four circumstances [that] may give rise to a strong inference of the requisite scienter:  where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*ECA*, 553 F.3d at 199 (internal quotation marks and citations omitted).

First, the Court disagrees with Bell's argument that the FAC does not allege that Bell played any role in the false statements.  Unlike the District of Arizona case Bell cites, the FAC here specifically alleges far more than signing certifications and forms.  *See S.E.C. v. Fraser*, No. Civ. 09-00443 (PHX) (GMSC), 2009 WL 2450508, at *7 (D. Ariz. Aug. 11, 2009).  Here the allegations are that Bell personally drafted the white paper which include the false statement that Alchemy's token was a registered security.  ¶¶ 38–39, 60, 135.  Further, the FAC alleges that

Bell drafted a business summary for Alchemy falsely stating that Alchemy had a functioning

lending platform.  ¶¶ 40, 136.  Such false statements are alleged to have been made to

fraudulently induce plaintiffs to invest in and provide services for Alchemy.  ¶ 137.  Further, the

plaintiffs allege that the false statements were knowingly made in connection with the sale of a

security because Bell's consulting agreement stated that he would assist in drafting the white

paper "relating to the Initial Coin Offering."  ¶ 30.

      The term "security" is defined to include investment contracts, 15 U.S.C.A. § 78c(a)(10),

and the Supreme Court of the United States has defined an investment contract to be "a contract,

transaction or scheme whereby a person invests his money in a common enterprise and is led to

expect profits solely from the efforts of the promoter or a third party[.]"  *S.E.C. v. W.J. Howey

Co.*, 328 U.S. 293, 298–99 (1946).  Recently, courts in this district have applied the *Howey* test

to determine that similar cryptocurrency tokens intended to be sold on a blockchain or in the

general market were securities within the meaning of the Securities Act.  *See Balestra v.

ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019); *U.S. Sec. & Exch. Comm'n v. Kik

Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020).  Lastly, the false statements are

alleged to be "in connection with" the sale of the tokens as securities since the sale, as formalized

in the Token Purchase Agreement, occurred after the false statements.  *See First Fed. Sav. &

Loan v. Oppenheim, Appel, Dixon*, 629 F. Supp. 427, 439 (S.D.N.Y. 1986) ("To meet the 'in

connection with' requirement, the fraud practiced must have been prior to or contemporaneous

with the sale of securities." (internal quotation marks and citation omitted)).

      Plaintiffs have also adequately alleged scienter in satisfaction of the PSLRA and Rule

9(b).  The FAC explains that Bell's statements were false because the outside investments,

securities registrations, and lending platform did not exist.  ¶¶ 6, 51, 135.  Plaintiffs also allege

that Bell personally benefitted from the fraud, acted deliberately in providing the false

information, and knew that his statements were not accurate.  ¶¶ 86, 88–89, 108, 116.  These

allegations are more than sufficient to give rise to a strong inference of the requisite scienter at

this stage.  *See ECA*, 553 F.3d at 199.  Therefore, Bell's motion to dismiss is denied.

> ### vii.  *Section 12(a) of the Securities Act*

Although unclear, the Court interprets Bell's motion to argue for dismissal of the Section

12(a) Securities Act claim on the basis that (1) Bell is not a seller within the meaning of the law

and (2) plaintiffs have not sufficiently alleged fraudulent intent.  *See* Doc. 59-1 at 24–25.

Section 12(a) provides that:

> Any person who . . . offers or sells a security in violation of [Section 5] . . . shall be
> liable, subject to [the loss causation provision] of this section, to the person purchasing
> such security from him, who may sue either at law or in equity in any court of competent
> jurisdiction, to recover the consideration paid for such security with interest thereon, less
> the amount of any income received thereon, upon the tender of such security, or for
> damages if he no longer owns the security.

15 U.S.C.A. § 77*l*(a)(1).  Section 5, in turn, states that "[u]nless a registration statement is in

effect as to a security, it shall be unlawful" to sell or carry such security through interstate

commerce or the mail.  *Id.* § 77e(a).  Therefore, "[t]o state a claim under Section 12(a) a plaintiff

must establish:  (1) that there was a sale or offer to sell securities by the defendant; (2) the

absence of a registration statement; and (3) the use of the mails or the facilities of interstate

commerce in connection with the sale or offer."  *Silva Run Worldwide Ltd. v. Gaming Lottery

Corp.*, No. 96 Civ. 3231 (RPP), 1998 WL 167330, at *8 (S.D.N.Y. Apr. 8, 1998).

To state a claim under Section 12(a)(1) of the Securities Act, a plaintiff need not plead

scienter, reliance, or fraud.  *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004).  However,

the Second Circuit has determined that F.R.C.P. 9(b) applies to Section 12 claims insofar as the

claims are premised on allegations of fraud.  *Id.* at 171.

As explained above, plaintiffs' claims satisfy the scienter requirements of Rule 9(b).  *See* Section iii, *supra*.  The FAC also sufficiently alleges that Bell is a seller of securities within the meaning of this statute, both through the veil-piercing allegations and as a seller of the alleged cryptocurrency tokens.  The other elements of this claim are also sufficiently alleged.  Specifically, the FAC alleges that Bell and Alchemy offered to sell plaintiffs a token, ¶¶ 51–53, the token was not registered, ¶ 59, and defendants used interstate commerce in the form of emails and wire transfers in connection with the sale, ¶¶ 35–36, 40–41, 125.  Therefore, the motion to dismiss is denied.

### viii.   *Section 17(a) of the Securities Act*

Bell argues that plaintiffs have failed to state a claim for Section 17(a) of the Securities Act because they have not alleged fraud in the offer or sale of securities within the meaning of the statute.  Plaintiffs do not respond to this argument.   "[B]ecause plaintiff did not address defendant's motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed."  *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005) (collecting cases).

### ix.   *Aiding and Abetting Fraud*

Bell argues that plaintiffs have failed to state a claim for aiding and abetting fraud due to insufficient scienter allegations.  Further, Bell argues that the aiding and abetting claim is "derivative" of the substantive claims for violations of the Securities and Exchange Act.

"To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'"  *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292

(2d Cir. 2006)); *see also Oster v. Kirschner*, 77 A.D.3d 51, 55 (N.Y. App. Div. 2010).  "[A]ctual knowledge is required to impose liability on an aider and abettor under New York law."  *Id.* (internal quotations and citation removed).  "Substantial assistance exists where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated."  *Berman v. Morgan Keegan & Co., Inc.*, 455 F. App'x 92, 96 (2d Cir. 2012) (internal quotations and citation removed); *see also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (same).

Plaintiffs have sufficiently alleged each of the elements of this claim at this stage.  The FAC alleges the existence of a fraud in that Cheng fraudulently induced plaintiffs to invest in and provide services for Alchemy.  ¶ 35.  Plaintiffs further allege that Bell knew of the fraud because he had agreed with Cheng to create a fake business to induce investors to transfer them money.  ¶ 28.  Lastly, plaintiffs allege that Bell provided substantial assistance to the fraud by drafting a false white paper and business summary for use in fraudulently inducing investments and services.  ¶¶ 13, 29, 33, 40–41.  As explained above, plaintiffs have also satisfied Rule 9(b) in sufficiently alleging fraud—the detailed allegations regarding Bell and Cheng's agreements, conversations with plaintiffs, and documents and contracts exchanged adequately allege fraud. Further, although these allegations do overlap with the primary claims for fraud, "plaintiffs may plead both primary fraud *and* aiding and abetting; such a pleading strategy is legally permissible, as plaintiffs need not, at the motion to dismiss stage, choose amongst alternative theories of relief."  *King Cty., Washington v. IKB Deutsche Industriebank AG*, 751 F. Supp. 2d 652, 666 (S.D.N.Y. 2010).  The motion to dismiss is thus denied.

    x. *RICO Section 1962(c)*

  Bell argues that plaintiffs fail to state a claim under RICO Section 1962(c) because they have not sufficiently alleged scienter and he is not an "owner with authority" as defined in the law.

  Section 1962(c) of RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "To state a claim under 18 U.S.C. § 1962(c), one of RICO's substantive provisions, a plaintiff must plead four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 665 (2d Cir. 2014) (summary order) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). "Racketeering activity" includes any act indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B), which include, for purposes relevant to the present case, acts of wire fraud (18 U.S.C. § 1343), and fraud in the sale of securities. These acts must be plead with particularity in satisfaction of Rule 9(b). *See United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 443 (S.D.N.Y. 2004).

  To establish a "pattern" of racketeering activity, a plaintiff must plead "at least two predicate acts, [and] show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by

distinguishing characteristics and are not isolated events.'"  *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240).  Further, "a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)."  *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) (internal quotation marks omitted).

Plaintiffs allege that Bell conducted Alchemy's affairs through his position as majority shareholder, CEO, and founder of Alchemy Finance.  ¶¶ 13, 39, 79.  This satisfies the first two elements.  *See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (explaining that RICO liability can attach to anyone with "*some* part in directing the enterprise's affairs").  Plaintiffs have alleged at least two predicate acts:  that defendants perpetuated fraud in the sale of securities and engaged in wire fraud by drafting the fraudulent white paper and business summary to induce plaintiffs to invest $250,000 in the enterprise as well as by lying to plaintiffs to cover up the fraudulent statements concerning the alleged $30 million investment from Staxx.  ¶¶ 29–30, 39–40, 49–50, 81–82.  The Court has held that these allegations satisfy Rule 9(b).  Further, plaintiffs argue that they have alleged that defendants continued their efforts to defraud investors throughout 2018, which sufficiently constitutes a "closed-ended" scheme. ¶¶ 29, 33, 56, 82, 84 (allegations spanning from February 2018 into 2019).

While the Court cannot be sure of the ultimate merit of this claim, Bell's motion to dismiss contains only conclusory arguments with no legal support as to whether any of the elements are lacking.  Therefore, the Court finds no reason to dismiss this claim at this stage.

### c. Leave to Amend

Plaintiffs have requested leave to amend the complaint in the event that Bell's motion is granted.  Doc. 62 at 31.  Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Second Circuit has instructed courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)).  In *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, the Second Circuit reaffirmed the "liberal spirit" of Rule 15 and counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims.  797 F.3d 160, at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (per curiam)).

Here, because the unjust enrichment claim is duplicative and plaintiffs have abandoned the Section 17(a) claim, amendment would be futile, so leave to amend is denied.  *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 140 (2d Cir. 2011).

### IV.   CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED as to the claims for unjust enrichment and Section 17(a) of the Securities Act.  The motion to dismiss is DENIED as to the claims for breach of contract, fraudulent inducement, account stated, Section 10(b) and Rule 10b-5 of the Securities Exchange Act, Section 12(a) of the Securities Act, aiding and abetting fraud, and RICO Section 1962(c).

The Clerk of Court is respectfully directed to terminate the motions, Docs. 59 and 65.

It is SO ORDERED.

Dated:   March 29, 2022
         New York, New York

_____
Edgardo Ramos, U.S.D.J.