UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIGILYTIC INTERNATIONAL FZE
*and* RISHAN BHAGOWAT,

                Plaintiffs,

          – *against* –

ALCHEMY FINANCE, INC., ALCHEMY
COMPANY, LIMITED, ALCHEMY COIN
TECHNOLOGY, LIMITED, ALCHEMYZE
CAPITAL, LLC, SHENG-WEN CHENG,
JAHRIL TAFARI BELL, *and* DOES 1-20,

                Defendants.

**OPINION & ORDER**

20-cv-4650 (ER)

Ramos, D.J.:

      Digilytic International FZE and Rishan Bhagowat ("Plaintiffs") filed this action on June 17, 2020, against Alchemy Finance, Alchemy Company, Alchemy Coin, Alchemyze (collectively, "Alchemy"), and individual defendants Sheng-Wen Cheng, Jahril Tafari Bell, and Does 1-20. Doc. 1. Plaintiffs allege securities fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and various common law causes of action stemming from defendants' sale of purported securities in the form of cryptocurrency tokens, as well as breach of service agreements. *Id.* Cheng was served on July 6, 2020, and an answer was due by August 28, 2020. Doc. 22. Having failed to file an answer, the Clerk of Court issued Cheng a Clerk's Certificate of Default (the "Default") on September 4, 2020. Doc. 26. Similarly, a Certificate of Default was issued as to Alchemy on October 14, 2020. Doc. 39.

More than two years later, on November 29, 2022, Cheng filed a motion to set aside the Default on the basis that he was unable to answer the complaint because he was incarcerated and subject to stringent COVID-19 lockdown protocols. Doc. 77.

Pending before the Court is Cheng's motion to set aside the Default. Doc. 76; Doc. 77. For the reasons set forth below, Cheng's motion is GRANTED.

I.  BACKGROUND

A.  Factual Background

The facts underlying this case are more fully set out in the Court's March 29, 2022, Opinion, *Digilytic Int'l FZE et al., v. Alchemy Fin., Inc., et al.,* No. 21 Civ. 4650 (ER), 2022 WL 912965 (S.D.N.Y. March 29, 2022) familiarity with which is assumed. For present purposes, the Court provides an abbreviated summary and new, relevant facts herein.

Sheng-Wen Cheng, a South Korean national who resides in New York, is the co-founder and a controlling person of Alchemy. Doc. 57 ¶ 12. Bell is a resident of the District of Columbia. *Id.* ¶ 13. Bell started working with Cheng on February 1, 2018, as a co-founder and Chief Business Development Officer of Alchemy. *Id*. Additionally, Bell founded a company called Legacy Metropolitan, LLC on February 15, 2018. *Id*. A few months later, Bell became a majority shareholder and chief executive officer of Alchemy Finance. *Id*.

Cheng and Bell met in late 2017 or early 2018 and agreed to create an allegedly fraudulent business which would capitalize on the booming cryptocurrency industry. *Id.* ¶ 28. In January and February 2018, Cheng and Bell agreed to induce investors to transfer funds to them in exchange for a fraudulent "initial coin offering." *Id.* ¶ 29. The

scheme included preparing a "white paper" that described defendants' business. *Id.* ¶ 36. Specifically, the white paper described Alchemy as a "a blockchain-based peer-to-peer lending marketplace." *Id.* ¶ 37. Additionally, Cheng and Bell agreed to falsely tell potential investors that Alchemy had received a $30 million investment in their initial coin offering from Staxx Solutions Capital ("Staxx"), a Dubai-based company that Bell had a previous relationship with through Legacy. *Id.* ¶¶ 33–34.

On March 13, 2018, Cheng emailed Bhagowat, and provided a written business summary of Alchemy prepared by Bell. *Id.* ¶¶ 40–41. The summary reiterated the statements in the white paper by stating that defendants built a functioning blockchain-based peer-to-peer lending platform headquartered in New York "for Crypto investors who want a valuable investment opportunity . . . and for traditional financial investors looking for products that provide a higher rate of return." *Id.* ¶¶ 40, 42.

Five days later, on March 18, 2018, Cheng represented to Bhagowat via email and phone calls that defendants would sell Plaintiffs $250,000 worth of Alchemy cryptocurrency tokens. *Id.* ¶ 44. The next day, Cheng emailed Bhagowat and represented that Alchemy had a functioning beta version of its software that would support its cryptocurrency and operate its AI-powered lending platform. *Id.* ¶ 45.

On March 23, 2018, Cheng signed and delivered to Plaintiffs, a written "Token Purchase Agreement" on behalf of defendants that promised to sell and deliver securities in the form of Alchemy tokens to Plaintiffs. *Id.* ¶ 46. The agreement stated that Alchemy would "sell, convey, transfer, and deliver to [Plaintiffs] the corporation's Token[s]" in exchange for $250,000. *Id.* ¶ 47. In reliance of the business white paper, the business

3

summary, and Cheng's statements, Plaintiffs executed the Token Purchase Agreement on the same day. *Id.* ¶ 49.

Defendants also induced Plaintiffs to enter into two service agreements on March 24, 2018. *Id.* ¶ 62. First, Cheng executed the "Master Services Agreement" ("MSA"), which required Plaintiffs to provide Alchemy with marketing services in exchange for $32,000 a month plus expenses. *Id.* ¶ 64. Second, Cheng executed the "Advisory Agreement," which called for Plaintiffs to provide Alchemy with consulting services in exchange for payment of 0.5% of all funds raised by defendants. *Id.* ¶ 65. Plaintiffs performed their obligations under both agreements. *Id.* ¶ 71. Specifically, Plaintiffs organized a promotional dinner for Alchemy at the April 2018 Coachella music festival in southern California, for which they advanced defendants $21,000 to secure a venue at the event. *Id.* ¶ 72. Plaintiffs also sent a picture showing Alchemy's logo on a helicopter at the festival, pursuant to the parties' agreement in the MSA.[1] Doc. 86 at 6. Plaintiffs' invoices for their services under the MSA totaled $85,000; under the Advisory Agreement, Plaintiffs invoices total $230,000; neither invoice was paid. Doc. 57 ¶¶ 74–75, 101.

Plaintiffs transferred $250,000 to Alchemy by wire transfer on March 26, 2018. *Id.* ¶ 50. Plaintiffs executed the transfer with the expectation that they would receive a substantial return on their investment. *Id.* ¶ 54.

In July 2018, Bhagowat corresponded with Bell, inquiring as to how his $250,000 and the $30 million Staxx investment were being utilized. *Id.* ¶ 82. Bell responded that Plaintiffs' investment was being used to develop the trading platform while Staxx's

---

[1] Cheng asserts that Plaintiffs claimed the picture was real when in fact it was photoshopped. Doc. 86 at 6.

investment had been frozen by another Alchemy principal. *Id*. Bell also forwarded Plaintiffs a copy of a purported Token Purchase Agreement executed by a Staxx representative, whereby the representative invested the $30 million in two installments of $15 million, one upon execution on March 3, 2018, and the other on March 13, 2018. *Id.* ¶ 83. To corroborate the agreement, Bell forwarded Plaintiffs a receipt reflecting a wire transfer of $30 million from Staxx. *Id.* ¶ 84. Both the agreement and wire transfer were fraudulent. *Id.* ¶ 85.

Cheng and Bell continued to make knowingly fraudulent misrepresentations through 2018 and into 2019 by stating through internet publications that they were conducting "token swaps" that increased Alchemy's value and liquidity. *Id.* ¶¶ 56, 77. They also claimed that they had received further investments when in fact they had not. *Id.* ¶ 57. Relying on these representations, Plaintiffs continued to provide services to defendants. *Id.* ¶ 87. Eventually, Defendants ceased responding to Plaintiffs' communications and never paid them any money, allegedly using Plaintiffs investment for their own personal benefit. *Id.* ¶¶ 88–89.

Plaintiffs bring several claims for the three separate agreements executed with defendants: the Token Purchase Agreement, the MSA, and the Advisory Agreement. *Id.* ¶¶ 90–150. Under the Token Purchase Agreement, Plaintiffs allege fraudulent inducement, breach of contract, unjust enrichment, account stated, violation of Section 10b, 10b-5, Section 12 and 17 of the Securities Exchange Act, aiding and abetting fraud, and violation of RICO Section 1962(c). *Id.* Under the MSA, Plaintiffs claim fraudulent inducement, breach of contract, unjust enrichment, and violation of RICO Section 1962(c). *Id.* Finally, under the Advisory Agreement, Plaintiffs assert fraudulent

inducement, breach of contract, unjust enrichment, account stated, aiding and abetting fraud, and violation of RICO Section 1962(c).  *Id.*

### B. Procedural History

Plaintiffs filed this action on June 17, 2020.[2]  Doc. 1.  Cheng and Alchemy were served on July 6, 2020.  Doc. 22; Doc. 37.  Bell consented to receive electronic service on July 16, 2020.  Doc. 8.  On August 7, 2020, Bell filed an answer to the complaint *pro se*.  Doc. 13.  The same day, attorney Ross Evan Pitcoff filed a Notice of Appearance on behalf of Cheng and Alchemy.  Doc. 14.

Cheng and Alchemy's answer was due August 28, 2020, but on August 20, 2020, before an answer was filed, Cheng was arrested in connection with his illegal activities to obtain several small business loans that the Government made available during the COVID-19 pandemic.  *See USA v. Cheng*, 21 Crim. 261 (AJN), Doc. 1.  The Government alleged that Cheng engaged in a scheme to obtain more than $7 million in government-guaranteed loans by means of false and fraudulent pretenses when he made several misrepresentations, including about the number of employees and revenue earned, at his different businesses.  *Id.*

Cheng hired attorney Peter Katz to represent him in the criminal case on September 4, 2020.  *Id.*, Doc. 6.  On April 20, 2021, Cheng plead guilty to bank fraud, wire fraud, major fraud, and securities fraud.  *Id.*, Doc. 33.  While most of Cheng's criminal charges are unrelated to the present suit, the securities fraud included activities related to the instant case insofar as Cheng plead guilty to fraudulently inducing Plaintiffs

---

[2] The case as initially was assigned to Judge Alison Nathan on June 18, 2020.  The case was reassigned to this Court on December 10, 2021.  ECF entry on December 10, 2021.

to invest $250,000 in Alchemy, and to enter into the MSA without paying the invoiced amounts. *Id.*, Doc. 28 at 3–4. In accordance with his plea, Cheng was sentenced to a term of 72 months on August 19, 2021. *Id.*, Doc. 33. Cheng was also ordered to pay $250,000 to Plaintiffs as restitution for the amount they invested in Alchemy.[3] *See id.*, Docs. 44, 45; *Digilytic International FZE et al v. Alchemy Finance, Inc. et al,* No. 20 Civ, 4650, Doc. 68.

On August 28, 2020, the date Cheng's answer to the complaint in the instant case was due, Pitcoff filed a motion to withdraw as attorney to Cheng and Alchemy, but failed to file an answer before withdrawing from the case. Doc. 17. The Court granted Pitcoff's motion to withdraw as counsel on September 2, 2020. Doc. 21. On the same day, Judge Nathan advised Alchemy that failure to retain counsel could lead to an entry of default against them. *Id.* As a result of Cheng's failure to file a reply to the complaint, Plaintiffs filed a motion for entry of a certificate of default on September 3, 2020. Doc. 23. The next day, the Clerk of Court issued the Default against Cheng. Doc. 26.

After Alchemy also failed to answer the complaint, Judge Nathan directed Plaintiffs to move for default against them. Doc. 30. As a result, Plaintiffs filed a motion of entry of default against Alchemy on October 14, 2020. Doc. 38. The Clerk of Court issued a Certificate of Default against Alchemy on October 16, 2020. Doc. 39. Concurrently, Plaintiffs notified Cheng on October 19, 2020, that they intended to file a motion for default judgment against him and Alchemy, by serving him through the inmate

---

[3] Neither the guilty plea, nor any other document, state whether restitution includes the alleged $85,000 owed to Plaintiffs for marketing services. However, the Government noted that Cheng violated the Securities Exchange Act when he engaged Plaintiffs to provide marketing services for Alchemy that he never paid. *USA v. Cheng*, Doc. 28 at 3. Thus, the unpaid marketing services under the MSA were contemplated in the guilty plea.

advocate at the prison where Cheng was being held, and by speaking with him via a telephone call.  Doc. 31; *see also* Doc. 81-3 (showing email communication between Kerry McCann, the inmate advocate, and Plaintiffs' lawyer, asking McCann to confirm delivery of the motion to Cheng and to set up a call with him).  Subsequently, on October 16, 2020,  Plaintiffs filed a motion for default judgment against Cheng and Alchemy.  Doc. 40.  On September 21, 2021 Plaintiffs' motion was denied as to Cheng and Alchemy because granting the motion would prejudice Cheng's business partner Bell, who was actively participating in the case.  Doc. 71.

On February 24, 2021, Bell filed a motion to dismiss.  Doc. 52.  As a result of that motion, Judge Nathan directed Plaintiffs to notify the court and defendants whether they intended to file an amended pleading.  Doc. 54.  On March 12, 2021, Plaintiffs notified the court that they would file an amended pleading.  Doc. 56.  Thus, on March 17, 2021, Plaintiffs filed a first amended complaint ("FAC").  Doc. 57.  Bell filed a motion to dismiss the FAC on grounds that Plaintiffs did not state a claim as to any of their allegations against him pursuant to Rule 12(b)(6).  Doc. 65.  The Court, on March 29, 2022, granted Bell's motion to dismiss as to the claims of unjust enrichment and Section 17(a) of the Securities Act, but denied the motion as to the balance of the claims.  Doc. 72.  Additionally, on December 22, 2022, the Court adopted a scheduling order and discovery plan.  Doc. 83.

On November 14, 2022, Cheng sent a letter to the Court to note his intent to defend all claims against him.  Doc. 73.  In conjunction with his letter to the Court, on November 29, 2022, Cheng filed a motion to set aside the Default.  Doc. 76.  The motion principally argues that Cheng could not respond to the complaint because he was under

8

strict COVID-19 protocols and thus the Court should vacate the Default. Doc. 80. On December 14, 2021, Plaintiffs filed their opposition. Doc. 81.

## II.  LEGAL STANDARD

### A. Setting Aside Default Judgment

Because defaults are generally disfavored and are reserved for rare occasions, when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party. *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). Rule 55(c) provides: "[t]he [C]ourt may set aside an entry of default for good cause, and it may set aside a final default judgment under Rule 60(b). Fed. R. Civ. P. Rule 55(c).

In determining whether there is "good cause" to vacate an entry of default under Rule 55(c) of the Federal Rules of Civil Procedure, courts in the Second Circuit balance a three-factor test: (1) whether the default was willful; (2) whether the defendant demonstrates the existence of a meritorious defense to the defaulted claims; and (3) whether, and to what extent, vacating the default will cause the non-defaulting party prejudice. *W.B. David & Co. v. De Beers Centenary AG*, 507 F. App'x 67, 69 (2d Cir. 2013) (citation omitted); *see also Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, 455 (2d Cir. 2013) (holding that the court must weigh the factors) (citations omitted). These criteria must be applied in light of the Second Circuit's "oft-stated preference for resolving disputes on the merits." *Enron Oil Corp.*, 10 F.3d, at 95 (citation omitted); *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981) (per curiam) ("the extreme sanction of a default judgment [is] a weapon of last, rather than first, resort.") (citations omitted). In

other words, "good cause" should be construed generously.
*Enron Oil Corp.*, 10 F.3d, at 96.

### B. *Pro Se* Litigant

Litigant's rights are heightened when the party held in default appears *pro se*. *Enron Oil Corp.*, 10 F.3d, at 96. A party appearing without counsel is afforded extra leeway in meeting the procedural rules governing litigation, and trial judges must make some effort to protect a party so appearing from waiving a right to be heard because of his or her lack of legal knowledge. *Id.*; *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam) (allegations of *pro se* complaint are held to less stringent standard than formal pleading drafted by lawyers when court considers a motion to dismiss). Hence, a district court should grant a default judgment sparingly and grant leave to set aside the entry of default freely when the defaulting party is appearing *pro se*. *Enron Oil Corp.*, 10 F.3d, at 96.

## III. DISCUSSION

### A. Willfulness of the Default

Willfulness refers to conduct that is deliberate, rather than merely negligent or careless. *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998) (citations omitted). In order to find that a default was willful, "it is sufficient to conclude that the defendant defaulted deliberately." *Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015) (internal quotation marks and citation omitted). Courts in this Circuit also consider "whether the defendant moved promptly to vacate the default upon notice of the judgment ... whether the defendant had actual notice of the action, and whether the defendant knew that the

plaintiff had a claim against them." *Durso v. Modern Food Center, Inc.*, No. 17 Civ. 7324 (LAK) (GWG), 2019 WL 2150424, at *5 (S.D.N.Y. May 17, 2019) (citation omitted). Thus, if a defendant "does not deny that he received the complaint, the court's orders ... or that he never answered the complaint," and "does not contend that his non-compliance *was due to circumstances beyond his control*," a court can infer willfulness. *Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, at 455 (emphasis added).

Cheng claims that his default was not willful because he believed his original attorney, Pitcoff, filed an answer to the complaint. Doc. 86 at 6. Further, he claims that when Pitcoff withdrew as his counsel he did not provide Cheng with any of the documents related to this matter. *Id*. at 4. Cheng also argues that this, coupled with the fact he was incarcerated under "intense COVID-19 lockdowns," prevented him from properly representing himself and filing an answer. *Id*. Cheng claims that the COVID-19 lockdowns prevented him from responding to the complaint because he did not have access to resources to conduct legal research since he was locked in his cell "twenty to twenty-four hours a day, seven days a week." *Id*. Cheng also alleges that the restrictions imposed on him by the prison meant that he could only communicate with counsel through prison staff, but that the communication had to first be initiated by counsel. *Id*.

In their opposition, Plaintiffs argue that Cheng's default was willful because Cheng initially appeared in the instant lawsuit but did not continue fighting the case. Doc. 81 at 12. Moreover, Plaintiffs argue that they properly notified Cheng through prison staff about the motion for default judgment they intended to file and thus he was aware of all the proceedings in the case. *Id.*; *see also* Doc. 31 (Plaintiff's attorney affidavit of service and an email confirming that Cheng was served through Kerry

11

McCann). Plaintiffs further claim that Cheng's criminal attorney, Peter Katz, was copied on all communications regarding the Default, and that Cheng was in communications with Katz during this time. Doc. 81 at 13; Doc. 81-3 at 1–8. Therefore, Cheng could have communicated with the Court via his criminal attorney, sought another attorney to represent him, or proceed *pro se*. Doc. 81 at 13. Lastly, Plaintiffs assert that Cheng was more than capable of communicating with the Court when Plaintiffs' counsel spoke with him on the phone on September 29, 2020. Doc. 81-3 at 2. Instead, Plaintiffs allege that during the call Cheng was dismissive and made it clear that he wanted nothing to do with the civil action. Doc. 81 at 13.

      The Court finds that Cheng's actions do not rise to the level of willfulness. Cheng does not deny he was properly served and notified of the motion for default judgment, but rather that COVID-19 protocols prevented him from filing an answer. Doc. 80 at 4. While Cheng may have been notified, he still faced several hardships to respond to the complaint, including not being able to perform the necessary research. Plaintiffs do not specifically dispute Cheng's assertion that he did not have access to legal resources. Doc. 81 at 12–13. Rather, Plaintiffs conclude that Cheng's references to COVID-19 protocols are "lies" while suggesting that he had access to receive and send mail. *Id.* Plaintiffs also do not explain how Cheng could have retained an attorney if the communication had to be initiated by counsel outside the prison. *Id.* In other words, Cheng's options were to require his criminal attorney to speak on his behalf for matters relating to his civil case, wait for outside counsel to contact Cheng, or have Cheng represent himself without the means to conduct legal research.

As Cheng has provided, the reason he could not respond was primarily because he was under strict COVID-19 protocols. Doc. 80 at 4. Other courts have held that the exigencies of the COVID-19 pandemic may excuse a party from default under certain circumstances. *See Elohim EPF USA, Inc. v. 162 D&Y Corp.*, 2021 WL 2292682, at *3 (S.D.N.Y. June 4, 2021) (holding that the most notable reason why defendant's default was not willful was because of delays caused by the COVID-19 pandemic); *see also Oppenheimer v. City of Madeira, Ohio*, 336 F.R.D. 559, 565 (S.D. Ohio 2020) (finding that because "the default [was] a result of unprecedented circumstances rising from the COVID-19 pandemic[,]" it was not willful). Thus, the Court finds that Cheng's failure to respond to the complaint was not willful.

### B. Meritorious Defense

The second factor requires that the defaulting party demonstrate the existence of a meritorious defense. *Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d at 455. To make a sufficient showing of a meritorious defense, a defendant need not prove the defense conclusively, but need only present facts that if proven at trial, would constitute a complete defense. *S.E.C. v. McNulty*, 137 F.3d 732, 740 (2d Cir. 1998); *Enron Oil Corp.*, 10 F.3d, at 98. Importantly, "all doubts should be resolved in favor of those seeking relief under Rule[ ] 55(c)." *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983).

Cheng argues that he has meritorious defenses for the claims against him relating to the Token Purchase Agreement, the MSA, and the Advisory Agreement. Doc. 86 at 5–9.

     *i.*    *The Token Purchase Agreement and MSA*

The essence of Cheng's argument is that he relied on Bell and other business partners' misrepresentations when he entered into the agreements with Plaintiffs and, as a result, Cheng plans to allege crossclaims and third-party defenses, if the Court sets aside the Default. *Id.*

In opposition, Plaintiffs argue that Cheng does not have a meritorious defense because he has already plead guilty to securities fraud for conduct relating to the Token Purchase Agreement and the MSA. Doc. 81 at 13–15.

The Court finds that Cheng has not presented a meritorious defense to the claims arising out of the Token Purchase Agreement or the MSA. Cheng has plead guilty to securities fraud for his actions in connection with both agreements, thereby precluding him from relitigating the issue. Doc. 81 at 13–14; Doc. 81-6 at 4; *see also USA v. Cheng*, Doc. 33.

As a general matter, a criminal conviction can have preclusive effect in a subsequent civil proceeding relating to the same issues. *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978). The doctrine of collateral estoppel, or issue preclusion, applies when the (1) the issues in both proceedings are identical; (2) the issue was actually litigated and decided; (3) there was full and fair opportunity to litigate in the prior proceeding; and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999) (internal quotation marks and citation omitted).

Here, the securities fraud scheme that Cheng plead guilty to included Cheng's misrepresentations concerning the sale of cryptocurrency to Plaintiffs, and the unpaid

14

marketing services under the MSA. Doc. 81-6 at 3–4. In accordance with the guilty plea, Judge Nathan ordered Plaintiffs to submit a status letter detailing how much they are owed in restitution. Doc. 68. As was confirmed by the Government, Cheng owes Plaintiffs $250,000 in restitution.[4] Doc. 81-8.

In its sentencing memorandum, the Government alleged that Cheng, in committing securities fraud, "made brazen misrepresentations about Alchemy Coin's access to capital . . . [and] convinced . . . an investor to . . . to provide marketing services . . . [but] did not . . . pay the invoices." Doc. 81-6 at 3–4. Thus, the securities fraud scheme stemming from the sale of cryptocurrency and unpaid marketing services is identical to the issue Cheng plead guilty to. *See Linares v. City of White Plains*, 773 F. Supp. 559, 563 (S.D.N.Y. 1991) (internal quotations omitted) (holding that "the issue must have been material to the first action or proceeding and essential to the decision rendered therein ... and it must be the point actually to be determined in the second action or proceeding such that a different judgment in the second would destroy or impair the rights or interests established in the first.").

Cheng plead guilty for his unlawful actions regarding the Token Purchase Agreement and unpaid marketing services, despite having an opportunity to contest the charges. As a result, the issue was actually litigated and he had a full and fair opportunity to litigate the claims. *See Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2d Cir. 1986) (noting that the criminal defendant is barred from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair

---

[4] As previously noted, no document, including the guilty plea, states whether restitution includes the alleged $85,000 owed to Plaintiffs for marketing services. Doc. 81-6 at 3.

opportunity to litigate the issue); *United States v. Podell*, 572 F.2d, at 35 (finding that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case); *see also Gelb v. Royal Globe Ins. Co.* at 43) (noting that a party other than the Government may also assert collateral estoppel based on a criminal conviction). Therefore, because Cheng is collaterally estopped from asserting any defenses relating to his sale of cryptocurrency or unpaid marketing services, he does not have a meritorious defense to any claims arising out of the Token Purchase Agreement or the MSA.

    ii.    *Advisory Agreement*

Cheng argues that he has a meritorious defense to the claims arising out of the Advisory Agreement because, in relying on the misrepresentations of his business partners, who had allegedly lied to him about Alchemy's revenue potential, he truly intended to pay Plaintiffs for their advisory services. Doc. 86 at 6–7. He further alleges that Plaintiffs are liable for several tort claims stemming from their unsatisfactory work under the Advisory Agreement. *Id.* at 7. Thus, Cheng asserts that he intends to file several cross and counterclaims against his business partners and Plaintiffs for their alleged conduct, if the Court sets aside the Default. *Id.*

Plaintiffs argue that Cheng did not produce any substantive defenses to justify his alleged unlawful conduct. Doc. 81 at 14. Furthermore, Plaintiffs argue that allowing Cheng to file crossclaims would be futile since New York law does not allow indemnification when there is an allegation of an intentional tort against the defendant. *Id.* Specifically, Plaintiffs argue that Cheng intentionally made several fraudulent

16

misrepresentations to induce them into entering into the Advisory Agreement. Doc. 57 ¶¶ 66–68.

Of the six claims Plaintiffs allege against Cheng arising out of the Advisory Agreement,[5] Cheng does not have a meritorious defense to any of the fraud claims on the basis of indemnification,[6] since New York law does not allow indemnification where the Plaintiff alleges intentional wrongdoing. *Barbagallo v. Marcum LLP*, No. 11 Civ. 1358, 2012 WL 1664238, at *7 (E.D.N.Y. May 11, 2012) (citation omitted); *see Rock v. Reed–Prentice Div. of Package Machinery Co.*, 346 N.E.2d 520, 522 (N.Y.1976) (holding that when "the party seeking indemnification was himself partially at fault, the courts of [New York] State, and throughout the Nation generally, [have] refused to imply a right to [] indemnification against another who played an effective role in causing the damage.") (internal citations and quotations omitted); *see also Trustees of Columbia Univ. in City of N.Y. v. Mitchell/Giurgola Assocs.*, 492 N.Y.S.2d 371, 375 (1st Dep't 1985) ("[A] party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine.").

As to the rest of the claims, Cheng argues that Plaintiffs cannot support their breach of contract, unjust enrichment, and account stated claims for not paying the advisory services because he justifiably refused to pay them, namely, because Plaintiffs' services were unsatisfactory and even fraudulent. *See* Doc. 86 at 6 (noting that Plaintiffs sent an alleged photoshopped picture of Alchemy's logo on a helicopter at the Coachella festival and claimed the photo was real). Cheng also argues that his business partners are

---

[5] Plaintiffs allege fraudulent inducement, breach of contract, unjust enrichment, account stated, aiding and abetting, and RICO claims. Doc. 57 ¶¶ 90–150.

[6] Specifically, fraudulent inducement and aiding and abetting fraud. Doc. 57 ¶¶ 90–95; 132–141.

17

liable because they made misrepresentations to him and he intends to file crossclaims against them. *Id.* at 8–9.

The Court finds that Cheng does present a meritorious defense to the breach of contract, unjust enrichment, account stated, and RICO claims for the $230,000 allegedly owed pursuant to the Advisory Agreement. *Id.* at 5–9. Regardless of whether this defense will ultimately prevail, it would constitute a complete defense. As the Second Circuit has held, "[t]o satisfy the criterion of a 'meritorious defense,' the defense need not be ultimately persuasive at this stage. 'A defense is meritorious if it is good law so as to give the fact finder some determination to make.'" *In re JWP Info.Servs., Inc.*, 231 B.R. 209, 212 (Bankr.S.D.N.Y. 1999) (quoting *Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir.1996)). Accordingly, Cheng has established a meritorious defense, the validity of which will be tested in subsequent proceedings.

### C.  Prejudice to the Non-Defaulting Party

The last factor the Second Circuit considers is whether vacating the default would prejudice the non-default party. *W.B. David & Co. v. De Beers Centenary AG*, 507 F. App'x, at 69. A plaintiff may demonstrate prejudice by showing "that delay will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Davis v. Musler*, 713 F.2d, at 916 (2d Cir. 1983) (internal quotation marks and citation omitted). However, delay alone is not a sufficient basis for establishing prejudice, "[s]omething more is needed." *New York v. Green*, 420 F.3d 99, 110 (2d Cir. 2005). For example, the delay may be sufficient if the default would "thwart plaintiff's recovery or remedy." *Id.* at 108.

Cheng argues that Plaintiffs would not be prejudiced by having to litigate the claims because (1) they already obtained a partial restitution order against him; (2) there has been no loss of evidence and adjudicating the case would not result or lead to difficulty in discovery since Cheng is currently incarcerated. Doc. 80 at 5–6. In response, Plaintiffs argue that they would be prejudiced in re-litigating issues that Cheng already plead guilty to in his criminal trial. Doc. 81 at 15–16.

The Court finds that Plaintiffs would not be prejudiced by setting aside the Default against Cheng. Here, Plaintiffs do not make an argument showing that litigating the claims would lead to any difficulty to conduct discovery or that doing so would prejudice them in anyway. *Prestige Capital Corp. v. Fuber LLC*, No. 16 Civ. 9577, 2017 WL 2558803, at *4 (S.D.N.Y. June 5, 2017) (holding that where Plaintiffs do not make an argument that delay would result in the loss of evidence, add difficulty to discovery, or provide opportunities for fraud or collusion there is no significant prejudice to Plaintiff) (internal quotations omitted). In fact, as Cheng noted, it does not appear that vacating the Default would lead to increased difficulty of discovery, or provide Cheng a greater opportunity for fraud, since Cheng is currently incarcerated. *Davis v. Musler*, 713 F.2d, at 916.

Plaintiffs are also actively engaged in discovery with Bell, Cheng's business partner and co-defendant here, Doc. 57, pursuant to the scheduling order. Doc. 83. Thus, Plaintiffs' recovery would not be thwarted by setting aside the Default as the discovery and remedy sought against Bell is for the same or similar conduct alleged against Cheng. Doc. 57.

19

Finally, Plaintiffs claim that they would be prejudiced in relitigating claims Cheng already plead guilty to. Doc. 81 at 15–16. However, as set forth above, the Court has already held that Cheng is collaterally estopped from disputing the acts he had plead guilty to. As Cheng points out, he plead guilty to some, but not all, claims alleged by Plaintiffs. Doc. 86 at 9. Therefore, the Court finds that Plaintiffs would not be prejudiced in litigating the remaining claims against Cheng.

Taking into consideration the Second Circuit's strong preference in favor of deciding cases on the merits and noting that default judgment is an "extreme sanction ... of last, rather than first, resort," *Meehan v. Snow*, 652 F.2d, at 277, the Court finds that setting aside the Default is warranted in this instance.

### IV.  CONCLUSION

For the foregoing reasons, the motion to set aside the Default is GRANTED. Cheng is directed to answer the complaint by July 21, 2023. The Clerk of Court is respectfully directed to terminate the motion, Doc. 76, and mail a copy of this Order to Cheng.

It is SO ORDERED.

Dated:  June 30, 2023
        New York, New York

_____
EDGARDO RAMOS, U.S.D.J.