UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIGILYTIC INTERNATIONAL FZE
*and* RISHAN BHAGOWAT,

Plaintiffs,

– *against* –

ALCHEMY FINANCE, INC., ALCHEMY
COMPANY, LIMITED, ALCHEMY
COIN TECHNOLOGY, LIMITED,
ALCHEMYZE CAPITAL, LLC, SHENG-
WEN CHENG, JAHRIL TAFARI BELL,
*and* DOES 1-20,

Defendants.

**OPINION & ORDER**

20-cv-4650 (ER)

RAMOS, D.J.:

Digilytic International FZE and Rishan Bhagowat ("Plaintiffs") filed this action on June 17, 2020, against Alchemy Finance, Alchemy Company, Alchemy Coin Technology, Alchemyze Capital (collectively, "Alchemy"), and individual defendants Sheng-Wen Cheng, Jahril Tafari Bell, and Does 1–20. Doc. 1. Plaintiffs allege securities fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and various common law causes of action stemming from the defendants' sale of purported securities in the form of cryptocurrency tokens, as well as breach of service agreements. *Id.*

Before the Court are: (1) Cheng's motion to dismiss the First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(5), and 12(b)(6); and (2) his motion for reconsideration of the Court's previous order denying the imposition of sanctions against Plaintiffs' counsel pursuant to Federal Rule of Civil Procedure 11. For the reasons set forth below, Cheng's motion to dismiss is GRANTED in part and DENIED in part. His motion for reconsideration is GRANTED, and upon reconsideration, the request for Rule 11 sanctions against Plaintiffs' counsel is DENIED.

## I.    BACKGROUND

### A.  Factual Background[1]

The Court assumes familiarity with the background of this case, which is described in detail in the Court's two prior opinions.  *See Digilytic Int'l FZE et al., v. Alchemy Finance Inc., et al.*, No. 21-cv-4650 (ER), 2022 WL 912965 (S.D.N.Y. March 29, 2022) (the "March 29, 2022 Opinion"); *Digilytic Int'l FZE v. Alchemy Finance Inc.*, No. 20-cv-4650 (ER), 2023 WL 4288154 (S.D.N.Y. June 30, 2023) (the "June 30, 2023 Opinion").  An abbreviated summary of relevant facts is included below.

Rishan Bhagowat is a South African national and a resident of the United Arab Emirates.  ¶ 10.  Bhagowat is a principal of Digilytic International FZE d/b/a Sublime Group, a company with its principal place of business and citizenship in the United Arab Emirates.  ¶¶ 10–11.

Alchemy Finance is a Delaware corporation with its principal place of business in New York.  ¶ 14.  Alchemy Company and Alchemy Coin Technology are Hong Kong companies with their principal place of business in New York.  ¶¶ 15–16.  Alchemyze Capital is a New York limited liability company with its principal place of business and citizenship in New York.  ¶ 17.  Together, these four entities are referred to as "Alchemy."

Sheng-Wen Cheng, a South Korean national, is the co-founder and a controlling person of Alchemy.  ¶ 12.  Upon information and belief, Plaintiffs allege that Cheng held three different passports under different names from different countries, and also attempted to procure naturalization in the United States by entering into a fraudulent marriage.  *Id.*

Jahril Tafari Bell, a resident of the District of Columbia, is the co-founder of Alchemy.  ¶ 13.  On February 1, 2018, he started working with Cheng as the Chief

---

[1]  The following facts are based on the allegations in the First Amended Complaint, which the Court accepts as true for purposes of the instant motion.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  Unless otherwise noted, citations to "¶ _" refer to the First Amended Complaint, Doc. 57.

Business Development Officer of Alchemy. *Id*. Bell also founded a company called Legacy Metropolitan on February 15, 2018, about two weeks after he began working with Cheng and Alchemy. *Id*.

Cheng and Bell met in late 2017 or in early 2018 and agreed to create an allegedly fraudulent business which would capitalize on the booming cryptocurrency industry. ¶ 28. In January and February 2018, they agreed to draft a fraudulent "white paper" to distribute to investors to induce them to transfer funds to defendants in exchange for an allegedly fraudulent cryptocurrency "initial coin offering." ¶ 29. In February 2018, Cheng and Bell agreed to falsely tell potential investors that Alchemy had received a $30 million investment in their initial coin offering from Staxx Solutions Capital, a Dubai-based company. ¶¶ 33–34.

On March 13, 2018, Cheng emailed Bhagowat and provided a written business summary of Alchemy which was prepared by Bell. ¶¶ 40–42. The summary stated that Alchemy had built a functioning blockchain-based peer-to-peer lending platform headquartered in New York "for Crypto investors who want a valuable investment opportunity . . . [and for] traditional financial investors looking for products that provide a higher rate of return." ¶¶ 40–42.

On March 15, 2018, to induce Plaintiffs to transfer $250,000 and to convince them to provide marketing and advisory services, Cheng informed Plaintiffs by email and telephone of Staxx's purported investment in the offering. ¶ 35. On the same day, Cheng went to Alchemy's New York office and emailed the white paper Bell had prepared to Bhagowat, who was living in Dubai. ¶ 36. The white paper described Alchemy as "a blockchain-based peer-to-peer lending marketplace" that was "classifying [its] token sale as a [fully registered] security." ¶¶ 37–38. It also provided a percentage breakdown of Alchemy's business functions and listed the global markets in which they would invest funds. ¶ 38.

Also on March 15, 2018, Cheng participated in an interview on YouTube with David Weild, an advisor to Alchemy and former vice chairman of NASDAQ. ¶ 43. Cheng and Weild represented that Alchemy had raised significant investments and retained legal counsel to conduct fully registered securities offerings through the sale of cryptocurrency tokens. *Id.* On March 19, 2018, Cheng emailed Bhagowat and represented that Alchemy had a functioning beta version of its software that would support its cryptocurrency and operate its AI-powered lending platform. ¶ 45.

On March 23, 2018, Cheng signed a written "Token Purchase Agreement" on behalf of the defendants that promised to sell and deliver securities in the form of $250,000 worth of Alchemy tokens to Plaintiffs, which he then sent to them from Alchemy's New York office. ¶¶ 46, 47. In reliance on the white paper, the business summary, and Cheng's statements, Plaintiffs executed the Token Purchase Agreement while in Dubai and emailed it to Cheng's New York Alchemy office that same day. ¶ 49. Pursuant to the Token Purchase Agreement, Plaintiffs transferred $250,000 to Alchemy by wire transfer on March 26, 2018. ¶ 50. Plaintiffs executed the transfer with the expectation that they would receive a substantial return on their investment. ¶ 54.

Cheng and Bell also fraudulently induced Plaintiffs to enter into two service agreements on March 24, 2018. ¶ 62. First, Cheng executed a "Master Services Agreement" ("MSA") which required Plaintiffs to provide Alchemy with marketing services in exchange for $32,000 a month plus expenses. ¶ 64. Second, Cheng executed an "Advisory Agreement," which called for Plaintiffs to provide Alchemy with consulting services in exchange for payment of 0.5% of all funds raised by defendants. ¶ 65. Plaintiffs performed their obligations under both agreements. ¶ 71. Specifically, Plaintiffs organized a promotional dinner for Alchemy at the April 2018 Coachella Festival in southern California, for which they advanced the defendants $21,000 to secure a venue at the event. ¶ 72. Plaintiffs also sent a picture showing Alchemy's logo on a

helicopter at the festival, pursuant to the parties' agreement in the MSA.[2]  Doc. 86 at 6.
Plaintiffs' invoices for their services under the MSA totaled $85,000; under the Advisory
Agreement, Plaintiffs' invoices total $230,000.  ¶¶ 74–75, 101.  None of the invoices
were paid.  *Id.*

On April 5, 2018, Bhagowat met with Cheng in person in New York City, during
which Cheng apologized for not having yet paid Plaintiffs the money owed to them and
stated Alchemy would pay them shortly.  ¶ 73.

In July 2018, Bhagowat corresponded with Bell, inquiring as to how his $250,000
investment and the $30 million Staxx invested were being used.  ¶ 82.  Bell responded
that Plaintiffs' investment was being used to develop the trading platform while Staxx's
investment had been frozen by another Alchemy principal.[3]  *Id.*  Bell also forwarded
Plaintiffs a copy of a purported Token Purchase Agreement executed by a Staxx
representative, whereby the representative invested the $30 million in two installments of
$15 million, one upon execution on March 3, 2018, and the other on March 13, 2018.  ¶
83.  To corroborate the agreement, Bell forwarded Plaintiffs a receipt reflecting a wire
transfer of $30 million from Staxx.  ¶ 84.  Both the Token Purchase Agreement and wire
transfer receipt were fraudulent.  ¶ 85.

Cheng and Bell continued to make knowingly fraudulent misrepresentations
through 2018 and into 2019 by stating online that they were conducting "token swaps"
that they claimed increased Alchemy's value and liquidity.  ¶ 56, 77.  They also falsely
claimed that they had received further investments.  ¶ 57.  Relying on these
representations, Plaintiffs continued to provide services to the defendants.  ¶ 87.
However, the defendants never registered their tokens with the Securities Exchange
Commission (SEC).  ¶ 59.  Eventually, the defendants ceased responding to Plaintiffs'

---

[2] Cheng asserts that Plaintiffs claimed the picture was real when in fact it was photoshopped.  Doc. 86 at 6.

[3] The First Amended Complaint does not allege who the principal Bell referred to was.

communications and never paid them any money, allegedly using Plaintiffs' investment for their own personal benefit.  ¶¶ 88–89.

### B.  Procedural Background

Plaintiffs initially filed this action on June 17, 2020, and amended their complaint on March 17, 2021.[4]  Docs. 1, 57.  Plaintiffs bring several claims for the three separate agreements executed with the defendants:  the Token Purchase Agreement, the MSA, and the Advisory Agreement.  ¶¶ 90–150.  Under the Token Purchase Agreement, Plaintiffs allege fraudulent inducement, breach of contract, unjust enrichment, aiding and abetting fraud, and account stated claims.  *Id*.  They also allege violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act, Section 12 and 17 of the Securities Act, and a RICO violation.  *Id*.  Under the MSA, Plaintiffs claim fraudulent inducement, breach of contract, unjust enrichment, and a RICO violation.  *Id*.  Finally, under the Advisory Agreement, Plaintiffs assert fraudulent inducement, breach of contract, unjust enrichment, account stated, aiding and abetting fraud, and a RICO violation.  *Id.*

Cheng was served on July 6, 2020.  *See* Doc. 22 (affidavit of service and proof of follow up mailing).  On August 7, 2020, attorney Ross Evan Pitcoff filed a notice of appearance on behalf of Cheng and Alchemy.  Doc. 14.  Later that same day, Pitcoff filed a stipulated proposed order extending Cheng and Alchemy's time to respond to the complaint until August 28, 2020.  Doc. 15.  In the stipulated proposed order, Cheng and Alchemy expressly "reserve[d] all defenses, with the exception of any defenses based upon lack of proper service of process, which the Defendants waive herein."  *Id.* (emphasis added).  The Court entered the order on August 10, 2020.  Doc. 16.

On August 20, 2020, Cheng was arrested in connection with his fraudulent applications to obtain several small business loans that the Government made available

---

[4]  The case as initially was assigned to Judge Alison Nathan on June 18, 2020. The case was reassigned to the undersigned on December 10, 2021.  ECF entry on December 10, 2021.

during the COVID-19 pandemic.  *See USA v. Cheng*, 21-cr-261 (AJN), Doc. 1.[5]  On

August 28, 2020, the date Cheng's answer to the complaint was due, Pitcoff filed a

motion to withdraw as attorney for Cheng and Alchemy, but did not file an answer in the

instant case.  Doc. 17.  The Court granted Pitcoff's motion to withdraw as counsel on

September 2, 2020.  Doc. 21.

On April 20, 2021, Cheng pled guilty to bank fraud, wire fraud, major fraud, and

securities fraud.  *See USA v. Cheng*, 21-cr-261 (AJN), Doc. 33.  While most of Cheng's

criminal charges are unrelated to the present suit, the securities fraud charge included

activities related to fraudulently inducing Plaintiffs to invest in Alchemy and enter the

MSA.[6]  *Id*., Doc. 28 at 3–4.  In accordance with his plea, Cheng was sentenced to a term

of 72 months on August 19, 2021.  *Id*., Doc. 33.  Bhagowat submitted a victim impact

statement and was allowed to speak during Cheng's sentencing.  *Id*., Doc. 27.  Cheng was

also ordered to pay $250,000 to Bhagowat as restitution for the amount he invested in

Alchemy.[7]  *See id*., Docs. 44, 45.

---

[5]  Judicial notice of documents in the criminal case against Cheng is appropriate "to establish the fact of such litigation and related filings."  *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *see also Boykins v. Lopez*, No. 21-cv-2831 (KMK), 2022 WL 2307684, at *4 (S.D.N.Y. June 27, 2022) ("[C]ourts within the Second Circuit routinely take judicial notice of criminal complaints, indictments, and other charging instruments.").

[6]  While the criminal complaint did not specifically name Plaintiffs, Cheng's alleged misconduct against them was clearly referenced in the facts of the case.  In its sentencing submission, the Government cited this case when it noted that Cheng "was sued for fraud in this District . . . by a victim of the securities fraud scheme discussed below."  *USA v. Cheng*, 21-cr-261 (AJN), Doc. 28 at 16.  The government also noted that Cheng "falsely told at least two prospective investors who ultimately invested a total of $275,000 that Alchemy Coin had already raised $40 million in funding, and even provided these investors with doctored bank documents supporting that misstatement."  *Id*., Doc. 28 at 4.  In reference to the MSA, the Government also stated "Cheng … engag[ed] [a] victim-investor to provide marketing services to Alchemy Coin, but then Cheng did not even pay the invoices for the marketing work."  *Id.*

[7]  Neither the plea agreement, nor any other document, states whether restitution includes the alleged $85,000 owed to Plaintiffs for marketing services.  However, the Government noted that Cheng engaged in a securities fraud scheme with "brazen misrepresentations," including convincing a victim to invest more funds by "engaging the victim-investor to provide marketing services" which Cheng never paid for.  Thus, the Court finds that it is reasonable to conclude that the unpaid marketing services pursuant to the MSA were referenced in the criminal case.

Because Cheng failed to file an answer in the instant case, the Clerk of Court issued a Certificate of Default against Cheng on September 4, 2020. Doc. 26. Similarly, a Certificate of Default was issued as to Alchemy on October 14, 2020. Doc. 39. On October 16, 2020, Plaintiffs filed a motion for default judgment against Cheng and Alchemy. Doc. 40. On April 9, 2021, Bell, Cheng's business partner, filed a motion to dismiss the First Amended Complaint. Doc. 59. On September 21, 2021, the Court denied Plaintiffs' motion for default judgment because granting the motion would prejudice Bell, who was actively participating in the case. Doc. 71. On March 29, 2022, the Court granted Bell's motion to dismiss the claims for unjust enrichment and Section 17(a) of the Securities Act, and denied the motion for all other claims. *See* March 29, 2022 Opinion.

Nine months later, on November 29, 2022, Cheng filed a motion to set aside the Clerk's Certificate of Default on the basis that he was unable to answer the complaint because he was incarcerated and subject to stringent COVID-19 lockdown protocols. Doc. 76. The Court granted his motion on June 30, 2023. *See* June 30, 2023 Opinion.

On October 26, 2023, Cheng moved to dismiss the First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(5) and 12(b)(6). Doc. 98. Separately, on October 31, 2023, Cheng moved for sanctions against Plaintiffs' counsel pursuant to Federal Rule of Civil Procedure 11 for bringing a frivolous RICO claim. Doc. 101. The Court denied his sanctions motion on November 8, 2023, finding that the procedural requirements of Rule 11 had not been met. Doc. 103 at 4. Specifically, the Court found that Cheng had not submitted evidence that he complied with the so-called safe harbor provision, which requires a draft of the motion to be served on the offending party at least 21 days before filing the motion with the Court. *Id.* On November 28, 2023, Cheng filed a motion for reconsideration of the Court's November 8, 2023 order denying his motion for sanctions, noting that he had provided the notice required by Rule 11 and providing a copy of the notice. Doc. 106.

## II.    LEGAL STANDARDS

### A.   Motion to Dismiss

#### 1.  Federal Rule of Civil Procedure 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. National Australia Bank Ltd*., 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted).  When determining if a federal court has subject matter jurisdiction and standing is challenged on the basis of the pleadings, the Court "accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the [the plaintiff]."  *Connecticut v. Physicians Health Services of Conn., Inc*., 287 F.3d 110, 114 (2d Cir. 2002) (citation omitted).  However, the burden remains on the plaintiff, as the party invoking federal jurisdiction, to establish its standing as the proper party to bring this action.  *See Selevan v. N.Y. Thruway Authority*, 584 F.3d 82, 89 (2d Cir. 2009); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record ... [and the plaintiff must] allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.") (internal quotation marks and citation omitted).  Further, "[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc*., 752 F.3d 239, 243 (2d Cir. 2014) (alteration in original) (citations omitted).

#### 2.  Federal Rule of Civil Procedure 12(b)(5)

In considering a motion to dismiss pursuant to Rule 12(b)(5) for insufficient service of process, courts look to Federal Rule of Civil Procedure 4, which governs service of process.  The Second Circuit has held that Rule 4 is to be construed liberally

"to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice." *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986) (citation omitted). Thus, upon a finding that service has not been completed or is otherwise insufficient, courts have discretion to dismiss the case or simply quash the faulty service. *Ting Qiu Qiu v. Shanghai Cuisine, Inc.*, No. 18-cv-5448 (ER), 2021 WL 185040, at *2 (S.D.N.Y. Jan. 19, 2021) (citing *Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp. 2d 781, 796 (S.D.N.Y. 2008)). Accordingly, quashing the improper service, rather than dismissal of the action, is generally appropriate where proper service may still be obtained. *See Grant v. State*, No. 88-cv-8703 (RJW), 1989 U.S. Dist. LEXIS 5716, at *8–9 (S.D.N.Y. May 23, 1989). Quashal is particularly appropriate where, notwithstanding the insufficient service of process, the defendant nonetheless has actual notice of the action. *See Aries Ventures, Ltd. v. Axa Finance. S.A.*, 729 F. Supp. 289, 303 (S.D.N.Y. 1990). But a court may dismiss an action when it appears that "there is simply no reasonably conceivable means of acquiring jurisdiction over the person of the defendant." *Romandette*, 807 F.2d at 311 (citation omitted).

In considering a Rule 12(b)(5) motion, a court may also look to materials outside the complaint to determine whether it has jurisdiction. *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003). "Conclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served with process." *Id.* (citation omitted). When a defendant challenges the sufficiency of service pursuant to Rule 12(b)(5), "the plaintiff bears the burden of proving its adequacy." *Id.* (citation omitted).

### 3. *Federal Rule of Civil Procedure 12(b)(6)*

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or

"[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quotation marks omitted).

### B. Motion for Reconsideration

The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted). "A motion for reconsideration should be granted only when the [moving party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (internal quotation marks and citation omitted). It is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Surveys*, 684 F.3d at 52 (internal quotation marks and citation omitted). The decision to grant or deny a motion for reconsideration is within "the sound discretion of the district court." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (citation omitted).

### C. Rule 9(b) and the PSLRA

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See*, *e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'"); *see also In re HEXO Corp. Securities Litig.*, 524 F. Supp. 3d 283, 300 n.17 (S.D.N.Y. 2021) (applying

particularity standards to Securities Act claims notwithstanding plaintiffs' separation of claims and disclaimers of fraud).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See*, *e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).

Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also*, *e.g.*, *Slayton v. American Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (same).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Securities Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

### D. *Pro Se* Litigant

Here, the Court notes that Cheng is proceeding *pro se*. "A pro se litigant's papers must be construed liberally 'to raise the strongest arguments they suggest.'" *Jules v. Andre Balazs Properties*, No. 20-cv-10500 (LGS), 2023 WL 5935626, at *2 (S.D.N.Y. Sept. 12, 2023) (quoting *Publicola v. Lomenzo*, 54 F.4th 108, 111 (2d Cir. 2022)). At the

same time, "*pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law." *Id.* (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006)).

## III.   DISCUSSION

### A.  Motion to Dismiss

#### 1.  *Lack of Subject Matter Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(1)*

Subject matter jurisdiction in the instant action is based on federal question jurisdiction.  ¶ 24.  Cheng argues that because Plaintiffs' RICO and securities fraud claims fail on the merits, the case should be dismissed pursuant to Rule 12(b)(1) because it does not demonstrate the existence of a federal question.  Doc. 99 at 20–21.  Plaintiffs do not specifically respond to this argument, but generally allege that the First Amended Complaint adequately states RICO and securities fraud claims.  Doc. 111 at 14–20.

To determine whether federal question jurisdiction pursuant to Article III and 28 U.S.C. § 1331 exists, a district court's inquiry "depends entirely upon the allegations in the complaint" and asks whether the claim as stated in the complaint "arises under the Constitution or laws of the United States...."  *Carlson v. Principal Financial Group*, 320 F.3d 301, 306 (2d Cir. 2003).  The claims must not be "made solely or the purpose of obtaining jurisdiction nor wholly insubstantial and frivolous."  *Id.*  Additionally, "the question of whether a federal statute supplies a basis for subject matter jurisdiction is separate from, and should be answered prior to, the question of whether the plaintiff can state a claim for relief under that statute."  *Id.*

Here, the federal causes of action alleged are:  (1) Section 10(b) of the Securities Exchange Act (15 U.S.C § 78j) and Rule 10b-5(a)-(c) (17 C.F.R. § 240.10b-5), ¶ 120; (2) Section 12(a) of the Securities Act (15 U.S.C. § 77*l*[a]), ¶ 124; (3) Section 17(a) of the Securities Act (15 U.S.C. § 77q[a][1]-[3]), ¶ 130; and (4) the RICO statute, 18 U.S.C. § 1962(c), ¶ 150.  Cheng does not provide any reason that the claims were made solely for

the purpose of obtaining jurisdiction, nor are "wholly insubstantial and frivolous." *Carlson*, 320 F.3d at 306. Accordingly, the Court finds that it has federal question jurisdiction over the case. Cheng's motion to dismiss for lack of subject matter jurisdiction is therefore denied.

### 2. *Lack of Proper Service Pursuant to Federal Rule of Civil Procedure 12(b)(5)*

Next, Cheng argues that he was never properly served pursuant to Rule 4 because Plaintiffs did not properly serve him as an individual or Alchemy as a corporation. Doc. 99 at 22–26. Plaintiffs respond that pursuant to the Order entered on August 10, 2020, Cheng and Alchemy waived any defenses based on improper service of process. Doc. 111 at 20–21. That Order was entered pursuant to a joint application by counsel for Plaintiffs and Ross Pitcoff, who at the time was counsel for Cheng and Alchemy. Docs. 15, 16.

By the plain terms of the August 10, 2020 Order, Cheng is foreclosed from making any arguments based on insufficient service of process. *See Gomez v. City of New York*, 805 F.3d 419, 424 (2d Cir. 2015) ("[E]ach party is deemed bound by the actions of his lawyer agent.") (internal citations omitted). While Cheng represents that he did not know about his prior counsel's waiver, at no point has he disputed Pitcoff's authority to make representations on his behalf while he served as counsel in this case. The August 10, 2020 Order waiving any defenses based on improper service therefore remains in effect. Thus, the Court denies Cheng's motion to dismiss based on improper service.

### 3. *Failure to State a Claim Pursuant to Federal Rule of Civil Procedure 12(b)(6)*
#### a. *Plaintiffs' Abandoned Arguments*

As a preliminary matter, Cheng makes several arguments that Plaintiffs do not address. First, Cheng argues that the account stated claim should be dismissed as duplicative of the fraudulent inducement claim. Doc. 99 at 13. Second, Cheng moves to dismiss the unjust enrichment claim as duplicative of the breach of contract and fraudulent inducement claims. *Id.* at 12–13. Third, Cheng argues that Plaintiffs' Section

17(a) claim fails because the Securities Act does not provide a private cause of action. *Id.* at 16.

Because Plaintiffs did not address Cheng's motion to dismiss with regard to these claims, they are "deemed abandoned and [are] hereby dismissed." *Hanig v. Yorktown Central School District*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005) (collecting cases). The Court therefore grants the motion to dismiss the accounts stated, unjust enrichment, and Section 17(a) claims.[8]

   *b.  Fraudulent Inducement*

Cheng argues that the fraudulent inducement claim should be dismissed because Plaintiffs do not demonstrate reasonable reliance on his representations. Doc. 117 at 2. Plaintiffs counter that the First Amended Complaint sufficiently alleges reasonable reliance. Doc. 111 at 7–12.

To state a claim for fraudulent inducement under New York law, a claimant must allege that (1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss. *See Stephenson v. Pricewaterhouse Coopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order); *Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (stating that the fraudulent inducement elements are similar to common law fraud elements). In addition, "the [c]omplaint must . . . state with particularity the circumstances of the fraud under Rule

---

[8] The Court notes that it previously granted Bell's motion to dismiss the unjust enrichment claim because it was duplicative of the breach of contract and fraudulent inducement claim. *See* March 29, 2022 Opinion at *8. In that Opinion, the Court noted the account stated claim was duplicative of the fraudulent inducement claim, but declined to dismiss the claim *sua sponte* because Plaintiffs had not been heard on the issue. *Id.* at *9. Finally, Cheng is correct that Section 17(a) of the Securities Act does not provide a private right of action. *See Deng v. 278 Gramercy Park Grp. LLC*, No. 12-cv-7803 (DLC) (JLC), 2014 WL 1016853, at *6 (S.D.N.Y. Mar. 14, 2014), *report and recommendation adopted*, 2014 WL 4996255 (S.D.N.Y. Oct. 7, 2014).

9(b) and contain sufficient facts, accepted as true, to state claims for relief for common-law fraud that are facially plausible under Rule 8(a)(2)." *Woori Bank v. RBS Securities, Inc.*, 910 F. Supp. 2d 697, 700–01 (S.D.N.Y. 2012).

Here, Plaintiffs have sufficiently alleged fraudulent inducement by alleging that Cheng emailed Plaintiffs a fraudulent white paper and business summary that described Alchemy as a blockchain-based peer to peer lending platform that was selling its tokens as registered securities, and that Cheng represented to Plaintiffs by email and phone that Staxx had invested $30 million in Alchemy.  ¶¶ 30–32, 35–46, 52.  Further, they allege that Cheng knew his statements were false, made the statements with the intent to deceive Plaintiffs, and was trying to induce them to purchase tokens and provide services.  ¶¶ 51, 92.  In satisfaction of Rule 9(b)'s heightened pleading requirements, Plaintiffs have explained that the statements were false because the lending platform, securities registration, and Staxx investment did not exist.  ¶¶ 6, 51, 135.  Further, the Court finds Plaintiffs' reliance on Cheng's statements to be reasonable.  Plaintiffs reviewed written investment materials from Cheng, entered into a written Token Purchase Agreement, and inquired as to the status of their $250,000 investment.  ¶¶ 36–42, 48, 49, 82.  Finally, Plaintiffs allege they sustained total of $565,000 in pecuniary losses.  ¶ 105.  In sum, each required element is sufficiently alleged.  Accordingly, the motion to dismiss the fraudulent inducement claim is denied.

### c.  Aiding and Abetting Fraud[9]

Cheng's argument against Plaintiffs' aiding and abetting claim is solely based on Cheng's contention that Plaintiffs have not adequately pled their fraudulent inducement claim.  *See* Doc. 99 at 10–11.  As explained in more detail above, the fraudulent

---

[9]  Cheng also moves to dismiss the aiding and abetting fraud claim predicated on violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Securities Exchange Act.  Doc. 99 at 16.  However, Plaintiffs only allege aiding and abetting pursuant to common law fraud, not violations of federal securities statutes.  *See* ¶¶ 132–133; *see also* March 29, 2022 Opinion at *13 (analyzing aiding and abetting fraud claim pursuant to New York state law).

inducement claim is sufficiently pled, and therefore the motion to dismiss the aiding and abetting fraud claim is denied. *See Edmar Financial Co., LLC v. Currenex, Inc*., No. 21-cv-6598 (LAK), 2023 WL 3570017, at *10 (S.D.N.Y. May 18, 2023) ("[D]efendants argue that plaintiffs have not pleaded adequately an underlying fraud claim and thus their conspiracy and aiding and abetting claims also must fail. The Court already has concluded that plaintiffs' fraud claims are well pled and defendants' argument therefore fails at the gate.").

### d. Breach of Contract

Cheng argues that Plaintiffs' allegations that they adequately performed pursuant to the Token Purchase Agreement, the MSA, and the Advisory Agreement are conclusory and vague.[10] Doc. 99 at 11–12. Plaintiffs argue that they did perform their obligations pursuant to the contracts. Doc. 111 at 13.

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the [party bringing the claim], (3) breach of contract by the [other party], and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citations omitted). "When pleading these elements, a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003) (citing *Levy v. Bessemer Trust Co., N.A.*, No. 97-cv-1785 (JFK), 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997)).

---

[10] Cheng also argues that his performance obligations were not triggered because certain conditions precedent were not met. A condition precedent "is an event, not certain to occur, which must occur, unless its non-performance is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (Am. Law Inst. 1981). "A contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." *Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan*, 239 F. Supp. 3d 710, 734 (S.D.N.Y. 2017). However, Cheng does not allege what the conditions precedent in the relevant contracts are. Accordingly, this argument does not provide a basis for dismissal.

Plaintiffs meet these standards. They allege the existence of three separate contracts between themselves and Alchemy: (1) Token Purchase Agreement, (2) the MSA, and (3) the Advisory Agreement. ¶¶ 49, 64, 65. First, Plaintiffs performed on the Token Purchase Agreement by wiring Alchemy $250,000, ¶ 50, and allege that the defendants breached the contract by never providing the non-existent tokens. ¶ 51. Plaintiffs allege $250,000 in damages for this breach. ¶¶ 98, 105. Second, Plaintiffs performed on the MSA by organizing a promotional dinner at the April 2018 Coachella Festival and providing other services, ¶¶ 72, 87, and allege that the defendants breached the contract by never paying their invoices. ¶ 102. Plaintiffs allege $85,000 in damages for this breach. *Id.* Lastly, Plaintiffs performed on the Advisory Agreement by providing marketing and consulting services,[11] ¶¶ 5, 65, 92–93, 97, and allege that the defendants breached the contract by never paying the 0.5% fee on all funds they raised. ¶ 101. Plaintiffs allege $230,000 in damages from this breach. *Id.* In sum, the Court finds that these allegations sufficiently show that Plaintiffs performed their obligations pursuant to the contracts at issue. Accordingly, the motion to dismiss the breach of contract claim is denied.

### e. *Section 10(b) and Rule 10b-5 of the Securities Exchange Act*

Cheng raises two arguments in his motion to dismiss the Section 10(b) and Rule 10b-5 claim. First, he argues that Plaintiffs should have known about the allegedly fraudulent securities offering from the fact that no Form D was filed with the SEC as of

---

[11] Specifically, the Advisory Agreement states that Bhagowat would "act as a mentor or advisor to [Alchemy] and provide advice and assistance" and be "available within a reasonable business timeframe during regular business hours whenever possible." Doc. 43-10 at 2. Here, the Court considers the Advisory Agreement because it was specifically incorporated by reference in the First Amended Complaint. *See DiFolco v. MSNBC Cable LLC.*, 622 F.3d 104, 111 (2d Cir. 2010). Plaintiffs assert that Bhagowat met, emailed, or otherwise communicated with the defendants multiple times, and met with Cheng on April 5, 2018. ¶¶ 44, 73, 78, 82. Moreover, it is uncontested that the defendants never paid the $230,000 invoice for Bhagowat's services. ¶ 101.

March 23, 2018, the date when Plaintiffs were sent the Token Purchase Agreement that purported to sell and deliver securities in the form of Alchemy tokens to Plaintiffs.[12] Thus, he argues that Plaintiffs were required to file suit no later than March 23, 2020 to come within the two years statute of limitations for a Section 10(b) and Rule 10b-5 claim. Doc. 99 at 13–14. Second, he argues that this claim is duplicative of Plaintiffs' fraudulent inducement, breach of contract, and unjust enrichment claims, because all of these claims "seek the same damages" based on the Token Purchase Agreement and associated transactions. *Id.* at 14. Plaintiffs counter that there is no basis to impose a duty for them to have determined on March 23, 2018 that Cheng's representation regarding the securities registration was false, and that Cheng's duplicity argument lacks legal precedent. Doc. 111 at 14–15.

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," while SEC Rule 10b-5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security." *In re OSG Securities Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013). To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, i.e., a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing

---

[12] Form D is a filing that is required by the SEC for companies selling securities under certain regulatory exemption provisions. *Filing and Amending a Form D Notice*, SEC, https://www.sec.gov/about/divisions-offices/division-corporation-finance/filing-amending-form-d-notice (last visited Aug. 21, 2024). The parties do not dispute that if Alchemy was in fact selling tokens that were registered as securities, it was required to file Form D.

economic loss. *In re Express Scripts Holding Co. Securities Litig.*, No. 16-cv-3338 (ER), 2017 WL 3278930, at *10 (S.D.N.Y. Aug. 1, 2017) (citations omitted).

As to the statute of limitations argument, Section 10(b)'s two-year "limitations period does not begin to run until ... a reasonably diligent plaintiff would have discovered the facts constituting the violation, including scienter[.]" *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010); *see* 28 U.S.C. § 1658(b).

The Court is unpersuaded by Cheng's argument that a reasonably diligent plaintiff would have discovered his misrepresentations by independently verifying whether a Form D was filed with the SEC on March 23, 2018. Cheng cites no caselaw supporting his point, nor is the Court aware of any precedent imposing this requirement. Moreover, the Court notes that whether and when Plaintiffs should have known about Cheng's misrepresentations is not a question that is ordinarily determined at the pleadings stage, and is instead reserved for the trier of fact. *See Yeadon v. New York City Transit Auth.*, 719 F. Supp. 204, 209 (S.D.N.Y. 1989) ("Ordinarily, whether or not a plaintiff knew or should have known the critical facts of the challenged claim is a question of fact.").

Cheng next argues that the Section 10(b) and Rule 10b-5 claim is duplicative of the fraudulent inducement, breach of contract, and unjust enrichment claims because they all they "all seek the same damages." Doc. 99 at 14. "Two claims are duplicative of one another if they 'arise from the same facts and do not allege distinct damages.'" *NetJets Aviation, Inc. v. LHC Comm'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (quoting *Sitar v. Sitar*, 854 N.Y.S.2d 536, 538 (2d Dep't 2008)). However, Plaintiffs' Section 10(b) and Rule 10b-5 claim stem from Cheng's alleged violations of federal securities law by making material omissions in connection with the sale of securities, while the other claims bring state common law claims based on the Token Purchase Agreement, the MSA, and the Advisory Agreement. Accordingly, the claims allege distinct damages regarding the violation of federal securities law and the breach of several contractual agreements.

Moreover, Cheng cites no law in support of his proposition that the claims are duplicative, nor is the Court aware of any authority holding that securities fraud claims cannot be pled alongside other state common law claims. To the contrary, other cases in this District involve securities fraud and state common law claims. *See, e.g.*, *Bouderau v. McCarthy*, No. 20-cv-4384 (NSR), 2024 WL 1765727, at *1 (S.D.N.Y. Apr. 24, 2024) (action alleging violations of Section 10(b) and Rule 10b-5, fraudulent inducement, breach of contract, and other state common law claims); *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 286 (S.D.N.Y. 2011) (action alleging violations of Section 10(b) and Rule 10b-5, breach of contract, fraudulent inducement, common law fraud, and other state common law claims). Accordingly, the motion to dismiss the Section 10(b) and Rule 10b-5 claim is denied.

> f.  *Section 12(a)(2) of the Securities Act*

Cheng first argues that Plaintiffs' Section 12(a)(2) claim fails because it falls outside the statute of limitations. Specifically, Cheng alleges the violation occurred on Mach 15, 2018, when, during an interview on YouTube, he represented that Alchemy had retained legal counsel in order to conduct a securities offering through the sale of cryptocurrency tokens. Doc. 99 at 15. If so, Cheng contends that the applicable statute of limitations lapsed one year later on March 15, 2019. *Id.* Second, Cheng argues that this claim is duplicative of Plaintiffs' fraudulent inducement, breach of contract, unjust enrichment, and Section 10(b) and Rule 10b-5 claims. *Id.* In response, Plaintiffs argue there is no reason to suggest they would have known that Cheng's March 15, 2018 statement, or other misrepresentations, were false. Doc. 111 at 15. While Plaintiffs do not specifically address Cheng's duplication argument, they do contend that the First Amended Complaint adequately alleges their Section 12(a)(2) claim. *Id.*

Section 12(a)(2) of the Securities Act provides that a person who offers or sells securities by means of a prospectus or oral communication that misrepresents or omits material facts is liable to the person purchasing such security from him. 15 U.S.C. §

77*l*(a)(2).  Claims brought pursuant to Section 12(a)(2) must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.  *Id*. § 77m.

The Court is not persuaded by Cheng's argument that March 15, 2018 started the statute of limitations period.  He provides no reason to suggest Plaintiffs' knew about the alleged misrepresentation on this date.  Moreover, as explained in more detail above, questions about when Plaintiffs learned about critical facts are ordinarily not decided at the pleadings stage.  *See Yeadon*, 719 F. Supp. at 209.

Next, Cheng asserts that this claim is duplicative of the fraudulent inducement, breach of contract, unjust enrichment, and Section 10(b) and Rule 10b-5 claims because they "all seek the same damages" based on the same Token Purchase Agreement and related transactions.  Doc. 99 at 15.  As explained in more detail above, violations of federal securities law are not duplicative of state common law claims based on violations of the relevant contracts in this case.  While Cheng asserts that Plaintiffs seek the same damages in relation to the securities law violations, "the law of this Circuit is clear that a plaintiff may simultaneously pursue duplicative remedies under the securities laws." *O'Connor & Assocs. v. Dean Witter Reynolds, Inc*., 529 F. Supp. 1179, 1193 (S.D.N.Y. 1981).[13]  Moreover, Cheng does not cite any precedent that any of the listed claims are duplicative of the Section 12(a)(2) claim, nor is the Court aware of such authority.

In his reply, Cheng also argues that Plaintiffs' claim fails because Plaintiffs only allege a private sale of securities, and Section 12(a)(2) only applies to public sales.  Doc. 117 at 5.  Some additional context is useful to understand Cheng's argument.  While the express language of Section 12(a)(2) refers to offers or sales of a security made "by

---

[13]  In addition, the alleged securities law violations present different claims for relief.  Section 10(b) of the Securities Exchange Act is a "catch-all provision" which creates liability for fraud "in connection with the purchase or sale of any security."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976).  In contrast, Section 12(a)(2) of the Securities Act "creates liability for material misrepresentations or omissions in connection with the initial sale and distribution of securities."  *In re Fuwei Films Securities Litig*., 634 F. Supp. 2d 419, 433 (S.D.N.Y. 2009).

means of a prospectus or oral communication," 15 U.S.C. § 77*l*(a)(2), the Supreme Court has clarified that the only oral communications actionable pursuant to this section are those that relate to a prospectus. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 567–68 (1995) ("The Courts of Appeals agree that the phrase 'oral communication' is restricted to oral communications that relate to a prospectus."). Consequently, this Circuit has held that Section 12(a)(2) does not apply to the private sales of securities. *See Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005) ("[A] Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary . . . Section 12(a)(2) applies only to offerings by means of a prospectus.") (internal quotation marks and citation omitted).

As currently pled, it appears that Plaintiffs allege the private sale of securities in the form of the Alchemy tokens to Plaintiffs as an investment. If this is the case, the Court is inclined to dismiss the Section 12(a)(2) claim. However, a party cannot raise an issue for the first time in a reply brief, as Cheng does here. *See Tavarez v. Moo Organic Chocolates, LLC*, 623 F. Supp. 3d 365, 370 (S.D.N.Y.). As Plaintiffs have not had an opportunity to be heard on this issue, the Court will not dismiss the claim for this reason at this time. *See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (requiring notice and opportunity to be heard before *sua sponte* dismissing a claim). Accordingly, the motion to dismiss the Section 12(a)(2) claim is denied.

### g.  *RICO § 1962(c)*

Cheng argues that Plaintiffs fail to state a RICO claim because they have not sufficiently alleged an enterprise, a pattern of racketeering activity, or a domestic injury. Doc. 99 at 17–20. Plaintiffs respond that each of these elements have been sufficiently alleged. Doc. 111 at 16–20.

Section 1962(c) of RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "To state a claim under 18 U.S.C. § 1962(c), one of RICO's substantive provisions, a plaintiff must plead four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 665 (2d Cir. 2014) (summary order) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). "Racketeering activity" includes any act indictable for crimes pursuant to 18 U.S.C. § 1961(1)(B), which include, for purposes relevant to the present case, acts of wire fraud, fraud in the sale of securities, procurement of citizenship or nationalization unlawfully (through Cheng's alleged marriage fraud), and fraud in connection to identification documents (through Cheng's alleged passport fraud). These acts must be pled with particularity in satisfaction of Rule 9(b). *See United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 443 (S.D.N.Y. 2004). Finally, § 1962(c) of RICO is available only to remedy a domestic injury that arose in the United States. *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023).

    *i.   RICO Enterprise*

For purposes of RICO, an "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961. The Second Circuit has acknowledged that "any legal entity may qualify as a RICO enterprise," but "[t]he enterprise must be separate from the pattern of racketeering activity and distinct from the person conducting the affairs of the enterprise." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (internal quotation marks and citation omitted). Moreover, the mere existence of an enterprise is not enough: "one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'" *Id.* at 175–76 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994)).

Here, Cheng argues that the First Amended Complaint fails to explain how Alchemy operates as an enterprise or is separate from its alleged pattern of racketeering activity. Doc. 99 at 17. However, the First Amended Complaint adequately alleges that Alchemy operated as an enterprise by representing it was legitimate business that had built a functioning blockchain lending platform. ¶ 2. The defendants engaged in a pattern of racketeering activity through, among other allegations, committing wire fraud[14] and fraud in the sale of securities. ¶¶ 12, 39, 77, 144. Finally, Cheng is liable because he participated in the "operation or management" of Alchemy. *Id*. Therefore, the First Amended Complaint successfully alleges the enterprise element.

    *ii. Pattern of Racketeering Activity*

To establish a "pattern" of racketeering activity, a plaintiff must plead "at least two predicate acts, [and] show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Cheng argues that the First Amended Complaint does not allege sufficient predicate acts, which Plaintiffs dispute. Doc. 111 at 17–18. In particular, Cheng alleges that Plaintiffs' allegations of marriage and passport fraud do not meet a vertical relatedness requirement required for predicate acts, and that allegations of securities fraud cannot serve as predicate acts in a RICO claim. Doc. 99 at 18–19. Each argument is addressed in turn.

---

[14] Specifically, Plaintiffs allege that "to obtain Plaintiffs' March 26, 2018 $250,000 wire transfer and to obtain Plaintiffs' services," Cheng and Bell "repeatedly engaged in wire fraud[.]" ¶ 144. *See* 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."). Here, the First Amended Complaint asserts that Cheng emailed and phoned Plaintiffs to inform them about the purported Staxx investment, ¶ 35; emailed the white paper to them, ¶ 36; and emailed the written business summary to them, ¶ 40. Cheng allegedly made these misrepresentations to induce Plaintiffs to invest in Alchemy. ¶¶ 35, 62, 63. Accordingly, the Court finds that the First Amended Complaint sufficiently alleges violations of the wire fraud statute.

*Marriage and Passport Fraud Allegations*

"Predicate crimes must be related both to each other (termed 'horizontal relatedness') and to the enterprise as a whole ('vertical relatedness')." *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017).  Horizontal relatedness requires "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id*. at 61. Vertical relatedness requires only "that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise." *Id.* "At the highest level of generality," both vertical and horizontal relatedness "can be established simply by connecting diverse predicate acts to an enterprise whose business is racketeering activity[.]" *United States v. Basciano*, 599 F.3d 184, 202 (2d Cir. 2010) (internal quotations and citations omitted).

Cheng solely challenges the allegations of marriage and passport fraud on the basis of the vertical relatedness requirement. Doc. 99 at 18.  Plaintiffs allege upon information and belief that Cheng committed marriage and passport fraud "all for the purpose of executing [his] fraudulent and criminal scheme." ¶¶ 12, 144.  The First Amended Complaint makes no other reference to these activities.  Based on the allegations in the First Amended Complaint, the Court finds that Plaintiffs do not plausibly allege that the marriage and passport fraud allegations are connected to the activities of the enterprise.  Thus, the Court finds that the vertical relatedness requirement is not met.

*Securities Fraud Allegations*

Regarding the remaining predicate acts, Plaintiffs also allege that Cheng perpetrated fraud in the sale of securities and engaged in wire fraud by drafting the fraudulent white paper and business summary to induce Plaintiffs to invest $250,000 in the enterprise, as well as by lying to Plaintiffs to cover up the fraudulent statements

concerning the alleged $30 million investment from Staxx.  ¶¶ 29–30, 39–40, 49–50, 81–82.  The Court has held that these allegations satisfy Rule 9(b).  However, Cheng argues that allegations of securities fraud cannot serve as predicate acts in a RICO claim.  Doc. 99 at 18.  Plaintiffs argue that the so-called "criminal exception" does allow their securities fraud allegation to serve as a predicate act.

Cheng is correct that RICO actions are generally not permissible when the predicate acts sound in securities fraud.  *See* 18 U.S.C. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities...").  But the securities fraud bar "does not apply to an action against any person that is criminally convicted in connection with the fraud."  18 U.S.C. § 1964(c). Here, the relevant inquiry is whether Cheng was criminally convicted in connection with the fraud.

Courts in this District have explained that the criminal conviction exception is only available to plaintiffs against whom a defendant has *specifically* been convicted of criminal fraud.  *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 389 (S.D.N.Y. 2014).  In other words, "RICO's criminal conviction exception is to be narrowly construed such that a defendant must have been criminally convicted of securities fraud encompassing the specific plaintiffs filing suit and the specific fraudulent conduct to which the defendant's conviction relates."  *Id.* at 391; *see also Estate of Gottdiener v. Sater*, 35 F. Supp. 3d 386, 395 (S.D.N.Y.), *aff'd*, 602 F. App'x 552 (2d Cir. 2015) (holding criminal conviction exception did not apply because "[n]othing except surmise connects Defendants' criminal convictions with [Plaintiffs].").

Here, Cheng's criminal conviction for securities fraud included activities related to Plaintiffs in the instant case.  Specifically, Cheng pled guilty to securities fraud relating to the precise fraudulent misconduct in this case:  inducing Plaintiffs to invest in Alchemy.  *USA v. Cheng*, 21-cr-261 (AJN), Doc 33, Doc. 28 at 3–4; *see also* Doc. 27 (Order allowing "a victim of Mr. Cheng's crimes, Rishian Bhagowat" to speak during

sentencing).  Cheng was also ordered to pay $250,000 in restitution to Bhagowat.  *See id.*,
Docs. 44, 45.  Accordingly, the criminal exception applies, and Plaintiffs are able to
allege a predicate act sounding in securities fraud.

In short, Plaintiffs successfully allege the following two predicate acts:  wire
fraud, and securities fraud.  Accordingly, the pattern of racketeering element is satisfied.

*iii.  Domestic Injury*

In his final argument, Cheng alleges that Plaintiffs do not satisfy the domestic
injury requirement because neither Bhagowat or his company are located in the United
States.  Doc. 99 at 19–20.  Plaintiffs do not dispute these facts, but respond that Cheng
and Alchemy's racketeering activities occurred in the United States such that the
domestic injury requirement is satisfied.  Doc. 111 at 19–20.

The Supreme Court has clarified that the domestic injury requirement "does not
mean that foreign plaintiffs may not sue under RICO."  *RJR Nabisco v. European
Community*, 579 U.S. 325, 353 n.12 (2016).  It provided additional guidance in the recent
case *Yegiazaryan v. Smagin*.  *See* 599 U.S. 533 (2023).  *Yegiazaryan* involved a Russian
plaintiff's RICO suit against a California resident who engaged in criminal activity
primarily in that state to prevent plaintiff from collecting on a judgment.  *Id.* at 536–37.
The Supreme Court held that "a plaintiff alleges a domestic injury for purposes of §
1964(c) when the circumstances surrounding the injury indicate it arose in the United
States."  *Id.* at 533.  The Court found sufficient domestic injury because "much of the
alleged racketeering activity that caused injury occurred in the United States," including
the defendant's creation of U.S. shell companies to hide his assets, submitting a forged
doctor's note to the California District Court, and intimidating U.S.-based witnesses.  *Id*.
at 545.

Like in *Yegiazaryan,* Plaintiffs allege that most of Cheng and Alchemy's
racketeering activities occurred in the United States.  Specifically, Plaintiffs allege Cheng
was a resident of, and Alchemy was headquartered in, New York.  ¶¶ 2, 12, 14–17.

Cheng made fraudulent statements from the United States, including his transmission of the white paper and Token Purchase Agreement to Plaintiffs, and communications to Plaintiffs regarding the Alchemy lending platform.  ¶¶ 36, 44, 45, 46, 48.  The First Amended Complaint also alleges that Bhagowat met with Cheng in person in New York, where Cheng continued his fraudulent misrepresentations.  ¶ 73.  Because these circumstances indicate the injury arose in the United States, the Court finds that the domestic injury requirement is met.

In sum, Plaintiffs have successfully alleged the elements of their RICO claim. Therefore, the motion to dismiss the claim is denied.

### B.  Motion for Reconsideration

As explained in more detail above, on November 8, 2023, the Court initially denied Cheng's motion for sanctions because it found that the procedural requirements of Rule 11 had not been met.  *See* Doc. 103.  Specifically, it noted that Cheng had not complied with the so-called safe harbor provision of Rule 11(c)(2).  *Id*. at 3.  This section provides that a motion for Rule 11 sanctions cannot be filed with the Court "until the alleged violator is provided 21 days to correct or withdraw the offending document."  *See Lawrence v. Richman Group of CT LLC*, 620 F.3d 153, 156 (2d Cir. 2010) (citing Fed. R. Civ. P. 11(c)(2)).  The Court denied Cheng's motion because he had not submitted any evidence that a draft of his motion was sent to opposing counsel, as required by the safe harbor provision.  Doc. 113 at 3.

On November 28, 2023, Cheng moved for reconsideration, submitting an affidavit and certified mail receipt indicating that he did send a draft of his motion to Plaintiffs' counsel on September 26, 2023.  Doc. 107 at 1.  Cheng alleges that he filed his motion for sanctions 28 days after Plaintiff's counsel received the draft.  *Id.* at 2.

Upon receiving Cheng's motion for reconsideration, the Court directed Plaintiffs to respond.  Doc. 108.  On December 15, 2023, Plaintiffs filed an opposition on arguing

against the imposition of sanctions on the merits, Doc. 109, but otherwise did not contest that Cheng had provided them with the draft motion.  *See* Doc. 109.

It is undisputed that this motion is not based on a change of controlling law or clear error.  However, the motion for reconsideration will still be considered due to the availability of new evidence.  The Court previously denied Cheng's motion on the sole basis that he did not satisfy Rule 11's safe harbor provision, and Plaintiffs do not contest that Cheng complied with the provision before filing his motion for sanctions. Accordingly, the motion for reconsideration is granted.

### C.  Motion for Sanctions

The Court now considers the merits of Cheng's motion for Rule 11 sanctions.  He argues that such sanctions are warranted against Plaintiffs' counsel because Plaintiffs' RICO claim is frivolous, is unsupported by the First Amended Complaint, and was only alleged in order to harass him.  Doc. 102 at 7–11.  In response, Plaintiffs generally allege that the RICO claim is not frivolous, is adequately pled, and was not filed for an improper purpose.  Doc. 109 at 1–6.

Rule 11 authorizes the Court to impose terminating and monetary sanctions when a party advocates for a factually or legally frivolous filing.  Fed. R. Civ. P. 11(b); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) (stating that "sanctions under Rule 11 are discretionary, not mandatory").  "The standard for imposing Rule 11 sanctions, however, is purposefully high, so as not to stifle legal creativity and zealous advocacy."  *City of Perry, Iowa v. Procter & Gamble Co.*, No. 15-cv-8051 (JMF), 2017 WL 2656250, at *2 (S.D.N.Y. June 20, 2017).  Rule 11 sanctions should be granted with caution, applied only when "a particular allegation is utterly lacking in support."  *In re Highgate Equities, Ltd.*, 279 F.3d 148, 154 (2d Cir. 2002) (internal quotation marks and citation omitted).  A court must review the facts "objectively," *see Storey v. Cello Holdings, LLC.*, 347 F.3d 370, 387 (2d Cir. 2003), and, "[w]hen divining the point at which an argument turns from merely losing to losing and

sanctionable, ... resolve all doubts in favor of the signer" of the pleading. *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (internal quotation marks and citation omitted).

The Court finds that Cheng's allegations lack merit. In support of his motion, Cheng merely rehashes his arguments for why the RICO claim should be dismissed pursuant to 12(b)(6), and accordingly argues that "Plaintiff's counsel cannot support the RICO claim, and asserted the RICO claim with the sole intention to harass" him.[15] Doc. 102 at 8–9. Cheng makes no further allegations that Plaintiffs have acted with the requisite unreasonableness to warrant Rule 11 sanctions. As explained above, the Court has already determined that the RICO claim is adequately stated. Accordingly, the Court finds that the RICO claim is not so "utterly lacking in support" or otherwise frivolous as to warrant Rule 11 sanctions. *See In re Highgate Equities, Ltd.*, 279 F.3d at 154. Cheng's motion for sanctions is therefore denied.

## IV.    CONCLUSION

For the reasons stated above, Cheng's motion to dismiss is GRANTED in part and DENIED in part. Cheng's motion is granted as to the accounts stated, unjust enrichment, and Section 17(a) claims, which are dismissed with prejudice as they were abandoned. *See Jennings v. Hunt Companies Inc.*, 367 F. Supp. 3d 66, 70 (S.D.N.Y. 2019) ("[T]he Court considers these claims abandoned and dismisses them with prejudice.").

The motion for reconsideration of the Court's November 8, 2023 Order is GRANTED, but the underlying motion for Rule 11 sanctions is DENIED.

The parties are directed to appear for a telephonic status conference at 10:00 a.m. on October 1, 2024. The parties are directed to dial (877) 411-9748 and enter access code 3029857# when prompted.

---

[15] Cheng also argues he is accused of marriage and passport fraud without any factual support. Doc. 102 at 8. However, as set forth above, the Court is not relying on these allegations.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 98 and 106, and to mail a copy of this Opinion to Cheng.

It is SO ORDERED.

Dated:  August 29, 2024
New York, New York

_____
EDGARDO RAMOS, U.S.D.J.